[L. A. No. 29602. In Bank. July 1, 1969.]

PURDY & FITZPATRICK, Plaintiff and Respondent, v. STATE OF CALIFORNIA et al., Defendants and Appellants.

[L. A. No. 29603. In Bank. July 1, 1969.]

PETER J. MOTSHAGEN, Plaintiff and Respondent, v. STATE OF CALIFORNIA et al., Defendants and Appellants.

Thomas C. Lynch, Attorney General, and Edward M. Belasco, Deputy Attorney General, Marilyn Shinderman, Gerald Friedman, Arthur Stahl and Lelia H. Jabin, for Defendants and Appellants.

Hillyer & Irwin and Ronald R. Hrusoff for Plaintiffs and Respondents.

Hill, Farrer & Burrill, Carl M. Gould, Stanley E. Tobin, Robert P. Hess, Richman, Garrett & Ansell and Lionel Richman as Amici Curiae on behalf of Plaintiffs and Respondents.

TOBRINER, J.—These cases involve a challenge to Labor Code section 1850, which basically prohibits the employment of aliens on public works.[1] Plaintiffs, contractors on public works, brought actions to declare section 1850 unconstitu-

---

[1]Section 1850 provides: "No contractor or subcontractor or agent or representative thereof shall knowingly employ or cause or allow to be employed on public work any alien, except in cases of extraordinary emergency caused by fire, flood, or danger to life or property, or except on work upon public military or naval defenses or works in time of war."

Section 1851.5 excepts from the provision of section 1850 aliens ad-

tional or otherwise invalid and to recover certain penalties paid for alleged violations of the section. The trial court, without opinion, granted plaintiffs' motions for summary judgment and awarded damages in the amount of the penalties assessed for violation of section 1850, plus interest and costs.

Defendant Division of Labor Law Enforcement of the State Department of Industrial Relations appeals from the summary judgments and urges that we reverse them and sustain the validity of Labor Code section 1850. Defendant Treasurer of the State appeals on the sole ground that Purdy & Fitzpatrick's complaint failed to state a cause of action for damages against her office.[2]

We have concluded: (1) that section 1850 encroaches upon the congressional scheme for immigration and naturalization; that section 1850 interferes with the operation of the extensive labor controls provisions of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. section 1101 et seq.; (2) that section 1850 offends the equal protection clause of the Fourteenth Amendment to the United States Constitution. Accordingly, we affirm the judgments to the extent that they constitute a declaration of the invalidity of Labor Code section 1850 and related sections.

We further hold: (3) that plaintiffs' exclusive remedy for the recovery of penalties consists of an action under Labor Code sections 1731-1733 against the awarding bodies of their respective contracts. Accordingly, we reverse the judgments to the extent that they purport to award plaintiffs recovery in damages against the Division of Labor Law Enforcement and the State Treasurer. To the extent that the trial court, awarded plaintiff Motshagen recovery in damages against the Division of Highways of the State Department of Public Works, we affirm that judgment.

Plaintiff Peter J. Motshagen, a contractor doing business under the firm name of D & M Sprinkler Co., undertook to perform landscaping for the Division of Highways of the State Department of Public Works on a state highway in San

mitted to the United States under the Refugee Relief Act of 1953 (50 U.S.C. App. § 1971 et seq.).

Section 1853 provides that penalties shall be assessed for violations of section 1850.

[2]Purdy & Fitzpatrick obtained a default judgment against the Treasurer for the penalty assessed in its case. The Treasurer has limited her appeal to attacking the judgment to the extent that it imposes a money judgment against her.

Diego County. The Division of Highways withheld $2,710 from the final payment under Motshagen's contract because of 271 alleged violations[3] of Labor Code section 1850. On August 17, 1967, plaintiff Motshagen sued the Division of Highways in the municipal court for breach of contract pursuant to Labor Code sections 1731-1733, seeking a return of the penalty assessed. The Division of Highways answered and joined issue over the lawfulness of the penalty assessment.

On January 18, 1968, plaintiff Motshagen moved in the municipal court for leave to file an amended complaint seeking additional relief in the form of a declaration that Labor Code section 1850 was unconstitutional or otherwise invalid. Motshagen simultaneously moved for transfer of the action to the superior court. On February 13, 1968, the municipal court granted plaintiff Motshagen's motions. In the superior court, Motshagen filed an amended complaint for damages and declaratory relief adding new parties defendant, namely the Division of Labor Law Enforcement of the State Department of Industrial Relations, and Does I through X.[4] Motshagen filed his amended complaint jointly with two additional plaintiffs, namely Purdy & Fitzpatrick (hereinafter referred to as Purdy), a corporation, and Hilario Torres, an alien employee.

Purdy, a landscape contractor, undertook to perform certain construction for the San Diego Unified Port District on a public park known as the Spanish Landing project in San Diego. Upon a determination of the Division of Labor Law Enforcement that Purdy had committed 228 violations of Labor Code section 1850, on October 23, 1967, Purdy paid a penalty of $2,280 under protest.[5] In the joint complaint Purdy sought to recover the penalty assessed and to obtain a declaration that Labor Code section 1850 was unconstitutional or otherwise invalid. Hilario Torres had worked as an employee for Purdy on the Spanish Landing project; he is a

---

[3]One alien working one day constitutes one violation. (Lab. Code, § 1853.)

[4]Plaintiffs described the Does in the complaint as ''Departments or agencies of the State of California or a political subdivision thereof, having an interest in the property which is the subject matter of the suit or in penalties collected from the plaintiffs and are liable in some manner to plaintiffs for penalties illegally assessed and collected.''

[5]Purdy does not allege to whom it paid the penalty, beyond stating that the Division of Labor Law Enforcement determined that it should forfeit the penalty ''to defendant.'' Since Purdy sued several defendants (including Does), we cannot discern which agency actually received the money.

citizen of the Republic of Mexico but was legally admitted into the United States as an immigrant in 1958. On March 20, 1961, Torres filed a declaration of intention of becoming a United States citizen. After the Division of Labor Law Enforcement determined that Purdy had violated Labor Code section 1850, Purdy discharged Torres and other aliens employed on the Spanish Landing project. In the joint complaint Torres sought a declaration that Labor Code section 1850 was unconstitutional.

Just as plaintiff Motshagen had done in his action, Purdy and Torres named the Division of Labor Law Enforcement as a party defendant. Labor Code section 95 charges the division with the duty to enforce certain provisions of the Labor Code, including section 1850. All three plaintiffs named additional defendants as "Does I through X" and alleged an interest by each of these entities in the subject matter of the controversy. Of those defendants which the record discloses received a summons and copy of the joint complaint, the San Diego Unified Port District appeared and answered, but the State Treasurer failed to enter an appearance before the trial court.

Of the several causes of action recited in the joint complaint, we are concerned only with the fourth and seventh causes of action, upon which the trial court granted plaintiffs' summary judgment. Each of these causes of action seeks a declaration of the invalidity of Labor Code section 1850 and a return of the penalties illegally assessed thereunder. Defendant Division of Labor Law Enforcement demurred to these causes of action, but the trial court overruled the demurrer. The Division of Labor Law Enforcement thereupon answered and put in issue all of the averments of the complaint going to the constitutionality and validity of Labor Code section 1850. The Division of Highways did not file an answer to plaintiff Motshagen's amended complaint and thus chose to stand on its original answer filed in the municipal court.

Pursuant to Code of Civil Procedure section 437c, plaintiff Motshagen moved that the trial court strike the answers of the Division of Highways and the Division of Labor Law Enforcement and that the court enter a summary judgment on the seventh cause of action against these defendants. Plaintiff Purdy moved that the trial court strike the answer of the Division of Labor Law Enforcement and that the court enter summary judgment on the third cause of action against this defendant. On June 13, 1968, the trial court granted

these motions without opinion. On June 27, 1968, the trial court awarded plaintiff Motshagen judgment in the sum of $2,710, representing the penalty assessed plus costs and pre-judgment interest, against defendants Division of Labor Law Enforcement and Division of Highways. On that date, plaintiff Purdy sought and obtained permission to amend its complaint to show the true name of defendant Doe I as the Treasurer of the State of California. On the same day, the trial court awarded judgment in the sum of $2,454.51, representing the penalty assessed plus costs and pre-judgment interest, against defendants Division of Labor Law Enforcement and the State Treasurer. The court entered the judgment against the Treasurer by default.

Defendant Division of Labor Law Enforcement appeals from the judgments favoring Motshagen and Purdy. The State Treasurer appeals from the default judgment favoring Purdy. The consolidated cases would normally have been heard on appeal by the Court of Appeal, Fourth Appellate District. Because of the great importance of the issue involved and because of the immediate statewide significance of a decision in these cases, we transferred the pending causes to this court upon application of the Division of Labor Law Enforcement.

The parties to this appeal are: Motshagen and Purdy (hereinafter referred to as plaintiffs), the Division of Labor Law Enforcement (hereinafter referred to as defendant), and the State Treasurer. In seeking to uphold the trial court's decision in this case, the plaintiffs are joined by the National Electrical Contractors Association and the Southern California District Council of Laborers as amici curiae.

1. *Labor Code section 1850 encroaches upon the congressional scheme for immigration and naturalization.*

■ Congress possesses the exclusive right to regulate immigration and naturalization. (*Fong Yue Ting* v. *United States* (1893) 149 U.S. 698 [37 L.Ed. 905, 13 S.Ct. 1016]; U.S. Const., art. I, § 8, cl. 4.) [6] State laws which substantially encroach upon the exercise of this power cannot stand. [7]

■ Courts have invalidated three types of state laws as infringements upon the competence of Congress to act in this area: (1) A state may not attempt to regulate or control

---

[6] *Hines* v. *Davidowitz* (1941) 312 U.S. 52, 62 [85 L.Ed. 581, 584, 61 S.Ct. 399]; *Chy Lung* v. *Freeman* (1876) 92 U.S. 275 [23 L.Ed. 550]; *Henderson* v. *Mayor of New York* (1876) 92 U.S. 259 [23 L.Ed. 543].

[7] *Truax* v. *Raich* (1915) 239 U.S. 33 [60 L.Ed. 131, 36 S.Ct. 7].

immigration as such, (*Henderson* v. *Mayor of New York, supra,* 92 U.S. 259 [23 L.Ed 543].) (2) A state law which burdens the general congressional power to admit aliens cannot be upheld. (*Truax* v. *Raich, supra,* 239 U.S. 33 [60 L.Ed. 131, 36 S.Ct. 7].) (3) When the Congress has enacted a comprehensive scheme for the regulation of a particular aspect of immigration and naturalization, a state law may not stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*Hines* v. *Davidowitz, supra,* 312 U.S. 52, 67 [85 L.Ed. 581, 586, 61 S.Ct. 399].) (Fn. omitted.)

. Labor Code section 1850 does not purport to regulate or control immigration as such. To some extent, however, section 1850 deters immigration and the subsequent entry of otherwise lawfully admitted aliens into California because it deprives them of the right to work upon public works. The United States Supreme Court, in *Truax* v. *Raich, supra,* 239 U.S. 33, held that an Arizona law, which effectively deterred interstate migration of aliens by imposing a substantial limitation upon employment opportunities, interfered with the power of the federal government to admit such persons to this country under acts of Congress.[8] Nevertheless, that court has upheld state laws applying exclusively to its alien inhabitants as a class when the state seeks to protect an existent "special public interest" and when the state law generates merely an "incidental effect" on immigration.[9] ▉
Regardless of whether section 1850 promotes a "special public interest" of this state,[10] we have concluded that the section

[8] "The assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the State would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work. And, if such a policy were permissible, the practical result would be that those lawfully admitted to the country under the authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the States as chose to offer hospitality." (239 U.S. at p. 42 [60 L.Ed. at p. 135].)

[9]*Zschernig* v. *Miller* (1968) 389 U.S. 429, 458-459 [19 L.Ed.2d 683, 702-703, 88 S.Ct. 664], Harlan, J., concurring; *Clarke* v. *Deckebach* (1927) 274 U.S. 392 [71 L.Ed. 1115, 47 S.Ct. 630]; *Terrace* v. *Thompson* (1923) 263 U.S. 197 [68 L.Ed. 255, 44 S.Ct. 15]; *Heim* v. *McCall* (1915) 239 U.S. 175 [60 L.Ed. 206, 36 S.Ct. 78]; *Patsone* v. *Pennsylvania* (1914) 232 U.S. 138 [58 L.Ed. 539, 34 S.Ct. 281]; but see, *Takahashi* v. *Fish & Game Com.* (1948) 334 U.S. 410 [92 L.Ed. 1478, 68 S.Ct. 1138].

[10]In *Heim* v. *McCall, supra,* 239 U.S. 175, the United States Supreme Court upheld a statute similar to Labor Code section 1850 on the ground that the state possessed broad power to act with respect to public employment. The "proprietary rationale" suggested in *Heim* rests upon the

must fail because it encroaches upon, and interferes with, a comprehensive regulatory scheme enacted by Congress in the exercise of its exclusive power over immigration.

The Immigration and Nationality Act of 1952, as amended (8 U.S.C. § 1101 et seq.) provides that all immigrants, excepting immediate relatives of United States citizens or of lawfully admitted resident aliens, who seek to enter the United States for the purpose of performing skilled or unskilled labor *shall be excluded* unless the Secretary of Labor certifies that there are not ''(A) sufficient workers in the United States who are able, willing, qualified, and available at the time (of application for a visa and admission to the United States and place to which the alien is destined) to perform such skilled or unskilled labor, or (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.'' (8 U.S.C. § 1182(a)(14).) Although the Secretary may pass upon applications for certification upon an individual basis, more often certification depends upon preexisting determinations that certain occupations are experiencing labor shortages within the United States. From time to time, the Secretary publishes schedules of such occupations in the Federal Register.[11]

Other labor-related provisions within the act create preferences for admission based upon the applicant's capability of performing specified skilled or unskilled labor for which labor shortages exist in this country (8 U.S.C. § 1153(a)(6)) or upon the applicant's possession of professional training or exceptional ability in the sciences or arts. (8 U.S.C. § 1153(a)(3).) Finally, an alien seeking to enter this country as a nonimmigrant in order to perform services or labor must establish that (1) he is of distinguished merit and ability and is coming to this country to perform temporary services of an exceptional nature requiring such merit and ability, or (2) the

premise that the state regulation of alien employment legitimately pursued a special public interest of the state, control of the expenditure of state monies. In *Takahashi* v. *Fish & Game Com., supra,* 334 U.S. 410, that Court found that the state's ownership of fish in its coastal waters provided an insufficient basis upon which to sustain a statute which forbade aliens from pursuing employment as offshore fishermen. Thus, *Takahashi* suggests the demise of the proprietary rationale as a basis upon which to sustain any wholesale exclusion of aliens from pursuit of a particular occupation or type of employment.

[11]See the most recent schedules and regulations in 29 C.F.R. (1969) part 60.

services or labor sought to be performed are such that unemployed persons capable of performing such services cannot be found in this country. (8 U.S.C. §§ 1184(b), 1101(a)(15)(H).)

The labor controls for immigrants reflect an intention to protect the American labor market from an influx of both skilled and unskilled foreign labor. (Senate Report No. 748, Judiciary Committee, First Sess., 89th Cong., 1965 U.S. Code Congressional and Administrative News 3328, 3333-3334.) Moreover, the act encourages the entry of both immigrants and nonimmigrants possessing those skills or kinds of labor which this country needs. The Legislative Assistant to the House Judiciary Committee which passed upon the 1952 act noted that, "the Act tends to serve the interests of the national economy, the cultural interests and the welfare of the United States by facilitating the entry for temporary residence of aliens whose specialized experience or exceptional ability would best serve the American needs." (Besterman, Commentary on the Immigration and Nationality Act (1953) 8 U.S.C.A. 1, 43.)

In light of the comprehensive federal scheme for dealing with the admission of aliens who seek to enter the American labor market, any state legislation affecting this same subject matter runs a high risk of conflict with the supreme law. ■ Thus, Labor Code section 1850 frustrates the accomplishment and execution of the purposes and objectives of the Immigration and Nationality Act of 1952, as amended. For example, the Secretary of Labor has certified that we face a nationwide shortage of architects and civil engineers. (29 C.F.R. (1969) pt. 60, sched. A.) If an architect specializing in public buildings or a civil engineer concentrating on highway construction seeks to immigrate to the United States and settle in California, the federal government, assuming he is otherwise qualified for admission, welcomes his immigration and may even grant him an immigration preference.[12] The State of California, however, virtually forbids him to make a living in this state. ■ Moreover, section 1850 interferes with the federal scheme for admission of nonimmigrants to perform temporary but essential services in this country; regardless of the national interest at stake, excepting national defense in time of war, California prevents such persons from

[12] 8 U.S.C. § 1153(a)(3).

performing otherwise valuable services simply because they labor upon public works.[13]

██ Under such circumstances the state statute encroaches upon the federal power over immigration; a state "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states." (*Takahashi* v. *Fish & Game Com., supra,* 334 U.S. at p. 419 [92 L.Ed. at p. 1487].) ██ "The assertion of an authority to deny to aliens the opportunity of earning a livelihood when lawfully admitted to the state would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work." (*Truax* v. *Raich, supra,* 239 U.S. at p. 42 [60 L.Ed. at p. 135].) Finally, a state law cannot stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*Hines* v. *Davidowitz, supra,* 312 U.S. at p. 67 [85 L.Ed. at p. 586].)

States, of course, may deal with matters of special concern which fall within their traditional legislative competence. Indeed, on this basis, the United States Supreme Court upheld a statute similar to Labor Code section 1850 in the case of *Heim* v. *McCall, supra,* 239 U.S. 175. We note, however, that the sufficiency of the state's proprietary interest over public employment may be insufficient on equal protection grounds to sustain the exclusion of aliens from an otherwise lawful enterprise.[14] Notwithstanding our doubts as to the remaining validity of the *Heim* decision, we may distinguish that case from the one before us on the ground that *Heim* did not involve a conflict with specific congressional legislation. (See *Hines* v. *Davidowitz, supra,* 312 U.S. at p. 69 & fn. 23 [85 L.Ed. at p. 588].) In the present case, Congress

---

[13]Indeed, the federal government may authorize the entry of non-immigrant laborers expressly for the purpose of obtaining employment upon public works in California. For example, such a policy decision might reflect a judgment that construction of the Interstate Highway System in California, in which the federal government possesses a significant financial stake, requires additional laborers to speed up its completion.

We recognize that the federal government has not yet made such a decision. We must nevertheless consider that the government might legitimately reach such a decision and effectuate it through the labor controls provisions of the Immigration and Nationality Act. Under such circumstances, Labor Code section 1850 operates as a hindrance to the fulfillment and execution of the purposes and objectives of the federal law.

[14]*Takahashi* v. *Fish & Game Com., supra,* 334 U.S. 410; see *infra,* heading 2.

has enacted a comprehensive federal scheme for immigration which seeks to regulate alien employment to some extent.

Nevertheless, defendant argues that California pursues the legitimate objective of the protection of the California labor market. But, the Secretary of Labor considers not only nationwide employment conditions but also regional, state, and local conditions.[15] He may decide, consistently with section 1850, that aliens seeking to settle in California and labor in the contract construction field or otherwise upon public works may not enter the country. On the other hand, however, he may determine to the contrary; in the face of such a determination and actual conflict, Labor Code section 1850 could not stand. We need not await an instance of actual conflict to strike down a state law which purports to regulate a subject matter which the Congress simultaneously aims to control. The opportunity for potential conflict is too great to permit the operation of the state law.[16]

California need not, however, abandon its concern for the state labor market. The gross remedy of section 1850 may not stand, but the state may and should inform the Secretary of Labor and other federal officials concerning the labor conditions within California and within particular industries or occupations. California does not remain, therefore, without power to act, but merely without power to act with final authority upon a matter for which Congress has determined that one national policy administered by the federal government should prevail.

California, with its blanket prohibition of alien employment upon public works, does interfere with the federal scheme. Section 1850 deters, if not effectively prevents, the entry or immigration of certain aliens who federal officers have determined, or might determine, possess a trade or skills which would enable them to contribute to the general welfare of the nation. To sustain section 1850 is to place a roadblock in the way of federal decision-makers and to sanction the frustration of a valid congressional purpose.[17]

---

[15]The certification required in 8 U.S.C. section 1182(a)(14) demands a consideration of the labor conditions in ''the place to which the alien is destined.''

[16]We have noted in the text *supra* that, with respect to architects and engineers, section 1850 may presently conflict with a determination of the Secretary of Labor.

[17]The Secretary of Labor may determine that there is a national shortage of persons available for work of any or a particular kind within the contract construction field; that, therefore, aliens willing and able to

We submit that the rigid prohibition of section 1850 must fail in the face of a conflicting federal exercise of power; Labor Code section 1850 encroaches upon the congressional scheme for immigration and naturalization and must be declared void.

2. *Labor Code section 1850 offends the equal protection clause of the Fourteenth Amendment to the United States Constitution.*

The Fourteenth Amendment applies to and protects all "persons"; therefore the equal protection clause extends to aliens. (*Yick Wo* v. *Hopkins* (1886) 118 U.S. 356 [30 L.Ed. 220, 6 S.Ct. 1064].)[18] Under the Fourteenth Amendment, the state may not condition public employment upon a waiver of constitutional right[19] nor may the state create arbitrary classifications for purposes of hiring and firing public employees.[20]

The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment. In cases involving "suspect classifications"[21]

---

work in this field may enter the United States; and that their entry and employment will not adversely affect wages and working conditions of the American labor market. If, however, some states bar such employment to aliens, these persons will settle and seek employment in those states which permit such employment. This concentration of aliens in a few states may create an adverse effect upon wages and working conditions in those states despite the nationwide shortages of labor. Such a result certainly frustrates the objectives of the federal scheme.

One might argue that the Secretary of Labor should refuse permission for admission to this country of all those who would settle in California and seek employment in contract construction fields. To argue that the California statute may to this extent control federal immigration decisions, however, defies the constitutional grant of exclusive congressional power to regulate immigration. (*Fong Yue Ting* v. *United States, supra,* 149 U.S. 698.)

[18]"The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws." (118 U.S. at p. 369 [30 L.Ed. at p. 226].)

[19]*Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 507 [55 Cal.Rptr. 401, 421 P.2d 409].

[20]*Wieman* v. *Updegraff* (1952) 344 U.S. 183, 191-192 [97 L.Ed. 216, 222-223, 73 S.Ct. 215].

[21]For example, racial classifications are "suspect." (*Korematsu* v. *United States* (1944) 323 U.S. 214, 216 [89 L.Ed. 194, 198, 65 S.Ct. 193].)

or "fundamental interests"[22] of those suffering discrimination, the United States Supreme Court prescribes a strict standard for reviewing the particular enactment under the equal protection clause. Not only must the classification reasonably relate to the purposes of the law,[23] but also the state must bear the burden of establishing that the classification constitutes a necessary means of accomplishing a legitimate state interest,[24] and that the law serves to promote a compelling state interest.[25]

Labor Code section 1850 discriminates on the basis of alienage, and such classification invokes a strict standard of review.[26] Moreover, the state may not arbitrarily foreclose to any person the right to pursue an otherwise lawful occupation.[27] Any limitation on the opportunity for employment impedes the achievement of economic security, which is essential for the pursuit of life, liberty and happiness; courts sustain such limitations only after careful scrutiny. Finally, a special mandate compels us to guard the interests of aliens: "[P]rejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry." (United States v. Carolene Products Co. (1938) 304 U.S. 144, 153 &

[22]Voting and the right of interstate movement are "fundamental interests." (Harper v. Virginia Board of Elections (1966) 383 U.S. 663 [16 L.Ed.2d 169, 86 S.Ct. 1079]; Shapiro v. Thompson (1969) 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322].)

[23]See the formulation of "reasonable relation" in F. S. Royster Guano Co. v. Virginia (1920) 253 U.S. 412, 415 [64 L.Ed. 989, 990, 40 S.Ct. 560].

[24]Loving v. Virginia (1967) 388 U.S. 1, 11 [18 L.Ed.2d 1010, 1017, 87 S.Ct. 1817]; McLaughlin v. Florida (1964) 379 U.S. 184, 196 [13 L.Ed.2d 222, 231, 85 S.Ct. 283].

[25]Shapiro v. Thompson, supra, 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322]. In reviewing various legislative classifications, the United States Supreme Court has tended to employ a dual-level test: In the area of economic regulation, that court has exercised judicial restraint relying upon any conceivable legitimate legislative purpose to uphold the law, and granting great deference to the legislative classification as relevant to that purpose. In cases involving suspect classifications or fundamental interests of those discriminated against, however, the court has adopted an attitude of vigorous scrutiny of the law. (See, Developments in the Law—Equal Protection (1969) 82 Harv.L.Rev. 1065, 1076-1077.)

[26]Takahashi v. Fish & Game Com., supra, 334 U.S. 410; Oyama v. California (1948) 332 U.S. 633, 640 [92 L.Ed. 249, 256, 68 S.Ct. 269]; Sei Fujii v. State (1952) 38 Cal.2d 718, 729 [242 P.2d 617].

[27]Konigsberg v. State Bar of California (1957) 353 U.S. 252, 262 [1 L.Ed.2d 810, 819, 77 S.Ct. 722].

fn. 4 [82 L.Ed. 1234, 1242, 58 S.Ct. 778].) We note that particular alien groups and aliens in general have suffered from such prejudice.[28] Even without such prejudice, aliens in California, denied the right to vote,[29] lack the most basic means of defending themselves in the political processes. Under such circumstances, courts should approach discriminatory legislation with special solicitude.[30]

Labor Code section 1850 arbitrarily discriminates by classifying persons without relation to any permissible purpose of that section. Section 1850 allegedly seeks to promote the establishment of acceptable wages and working conditions in the contract construction industry.[31] Although this objective constitutes a legitimate state interest, its statutory articulation cannot discriminate arbitrarily or otherwise classify persons without relation to the objective of the enactment.[32]

[28]See generally, Konvitz, The Alien and the Asiatic in American Law (1946) 148-189; Sei Fujii v. State, supra, 38 Cal.2d 718, 738 (Carter, J., concurring).

[29]Cal. Const., art. II, § 1.

[30]Professor Cox has suggested that the standard of review will depend upon "the relative invidiousness of the particular differentiation" and "the relative importance of the subject with respect to which equality is sought." (Cox, The Supreme Court, 1965 Term, Foreword: Constitutional Adjudication and the Promotion of Human Rights (1966) 80 Harv.L.Rev. 91, 95.) Because of judicial suspicion about any classification based upon alienage and because of our concern with the right of any individual to pursue an otherwise lawful occupation, we should strictly scrutinize the particular statute before us.

As to our observation that aliens are politically disadvantaged by reason of California's denial of suffrage, one commentator has suggested that the lack of suffrage for residents of the District of Columbia impelled the rigorous judicial review of the regulatory scheme involved in the case of Hobson v. Hansen (D.D.C. 1967) 269 F.Supp. 401, affd. sub. nom. Smuck v. Hobson, No. 21,167 (D.C.Cir., Jan. 21, 1969). (Developments in the Law—Equal Protection, supra, 82 Harv.L.Rev. 1065, 1126 & fn. 278.)

[31]Unemployment remains unaffected by the statutory scheme. Of course, all aliens are "unemployed" under the present classification. Presumably without section 1850 the numbers of unemployed would remain the same but they would include a more representative amalgam of aliens and citizens. Defendant may not argue that unemployment would rise without the law because the present scheme deters aliens from migrating to and seeking employment within California. To argue thus admits that section 1850 works a substantial and therefore impermissible impact upon immigration to and migration of aliens within this country. (See supra, p. 594.)

[32]The judicial inquiry may not end with a determination that the law applies equally to all those within a homogeneous class of persons. We must proceed further to ascertain whether the legislatively drawn distinctions which create the classes rationally relate to the purpose of the law. (McLaughlin v. Florida, supra, 379 U.S. 184, 191 [13 L.Ed.2d 222, 227, 85 S.Ct. 283].) Otherwise, we would sustain a statute which prohibited employment of blue-eyed persons merely because the law treated

The fact of alienage bears no relationship either to the suitability of those who work upon public projects or to the need of the laborer for such employment. Indeed, defendant has asserted no intrinsic differences between the alien and the citizen which would render the latter the more proper subject for the employment advantages bestowed by the section.[33] The classification does not reasonably relate to the permissible legislative goal of the protection of the labor market in the contract construction field.[34]

Defendant argues, however, that the state retains the right to protect its own citizens against alien economic competition. Such a purpose constitutes prima facie discrimination for its own sake; and if the state sought truly effective protection against alien economic competition by extending a prohibition of limitation against all types of alien employment, such a scheme would clearly offend equal protection. (*Truax* v. *Raich, supra,* 239 U.S. 33.)

May the state simply favor its own citizens in the disbursement of public funds? First, since aliens support the State of California with their tax dollars,[35] any preference in the disbursement of public funds which excludes aliens appears manifestly unfair. Second, section 1850 prevents aliens from

---

all blue-eyed persons alike. Such a statute would promote an objective of maintaining adequate wages and working conditions by reducing the labor supply and improving the bargaining position of the laborers permitted to work. The statute would rest upon an arbitrary classification, however, one which bore no rational relation to any legitimate legislative purpose.

[33]Because the statute explicitly excepts from the general prohibition alien employment upon military or naval defenses or works in time of war, California cannot claim that it concerned itself with a threat to state or national security presented by aliens. Moreover, the fact that aliens may labor directly for public entities (Lab. Code, § 1947) rebuts the argument that aliens are particularly unsuited for public employment.

The arbitrariness of the general scheme of state legislation, which permits aliens who have declared an intention to become citizens to work directly for public entities but prohibits these same persons from working indirectly for the public entity as employees of private contractors engaged on public works, further sustains the conclusion that the classification in Labor Code section 1850 cannot stand.

[34]The Legislature of course may lawfully prohibit employment of certain persons upon public works in order to protect the wages and working conditions of the laborers in that field and to promote the general welfare. The state could exclude from employment all persons under age 18 and over age 65, on the ground that the ages of such persons renders them relatively less fit for labor on public works. Also, the state may allow contractors and labor unions to bargain with respect to the persons whom the former will employ (i.e., those with seniority would be preferred). But such bargaining agreements may not reflect arbitrary or otherwise unconstitutional classifications.

[35]Revenue and Taxation Code, section 17041, subdivision (a).

receiving the federal funds which largely support the construction of our highways and other projects; the state can urge no claim to a "proprietary interest" in such federal funds. Finally, any classification which treats all aliens as undeserving and all United States citizens as deserving rests upon a very questionable basis. The citizen may be a newcomer to the state who has little "stake" in the community; the alien may be a resident who has lived in California for a lengthy period, paid taxes, served in our armed forces,[36] demonstrated his worth as a constructive human being, and contributed much to the growth and development of the state.[37]

Pursuing its argument that the state possesses proprietary power freely to prescribe the terms and conditions of public employment, defendant cites the case of *City of Pasadena* v. *Charleville* (1932) 215 Cal. 384 [10 P.2d 745], in which this court upheld the constitutionality of Labor Code section 1850. We rested our decision on two United States Supreme Court cases which together upheld a statute similar to section 1850. (*Heim* v. *McCall, supra,* 239 U.S. 175; *Crane* v. *New York* (1915) 239 U.S. 195 [60 L.Ed. 218, 36 S.Ct. 85].) Nevertheless, *City of Pasadena* must be reconsidered for two reasons: first, the case of *Takahashi* v. *Fish & Game Com., supra,* 334 U.S. 410, has cast doubt upon the vitality remaining in those earlier decisions; and second, developments in the law of equal protection require us to reexamine the bases underlying the holdings of those cases.[38]

The United States Supreme Court in *Heim* v. *McCall, supra,* 239 U.S. 175, the case relied upon by this court in originally upholding the constitutionality of Labor Code section 1850, rested its decision to sustain the statute there involved squarely upon the proposition that the state possesses all the rights of a private employer and therefore encounters no restrictions under the Fourteenth Amendment in the area of public employment.[39] The court held that a state may, therefore, freely regulate the terms and conditions of "public" employment as no person has a vested right to work for the state or any of its public agencies upon public

---

[36] 50 U.S.C. App. § 454.

[37] See *Sei Fujii* v. *State, supra,* 38 Cal.2d 718, 738 (Carter, J., concurring).

[38] See generally, *Developments in the Law—Equal Protection, supra,* 82 Harv.L.Rev. 1065.

[39] 239 U.S. at pp. 191-193 [60 L.Ed. at pp. 216-217].

work, citing *Atkin* v. *Kansas* (1903) 191 U.S. 207, 222-223 [48 L.Ed. 148, 157-158, 24 S.Ct. 124].

Commentators have seriously questioned the holding in *Heim,* especially its reliance upon the dicta of *Atkin* v. *Kansas, supra,* 191 U.S. 207.[40] In *Atkin,* the state sought to limit the hours of daily work for those employed on public works. An employer brought suit and challenged the regulation as an infringement of his right to contract. The United States Supreme Court held that the state, as the ultimate employer, exercises the right to prescribe the conditions upon which it would permit public work to be done on its behalf. In *Heim,* the court held *Atkin* controlling, without any apparent consideration of the differences between the two cases: *Atkin* involved a non-discriminatory statute; the party attacking the statute, an employer, asserted merely his right of freedom of contract; the case involved economic regulation and the court properly invoked a test of reasonableness.[41] In *Heim,* on the other hand, the court faced a discriminatory statute which excluded employees from otherwise lawful labor because of their status as aliens.

Recent developments in the law of equal protection have removed whatever validity *Heim* and *City of Pasadena* may have possessed at the time of their rendition. As we stated in *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d 499, 504, " 'The "power of absolute exclusion" is a term not identical with the "power of relative exclusion" or the "power to impose any burdens whatsoever." ' " (Powell, *The Right to Work for the State* (1916) 16 Colum.L.Rev. 99, 111.) Today courts and commentators alike recognize without question that the power of government, federal or state, to withhold benefits from its citizens does not encompass a supposed 'lesser' power to grant such benefits upon an arbitrary deprivation of constitutional right." (Fns. omitted.)[42] In the words of Mr. Justice Frankfurter, " 'Congress may withhold all sorts of facilities for a better life but if it affords

[40]See, e.g. Note, *National Power to Control State Discrimination Against Foreign Goods and Persons* (1960) 12 Stan.L.Rev. 355, 367; Note, *Constitutionality of Restrictions on Aliens' Right to Work* (1957) 57 Colum.L.Rev. 1012, 1017-1018.

[41]See fn. 25, *supra.* Furthermore, the court in *Atkin* suggested that a more stringent standard of review would apply when the state action infringed "the personal rights of others." (191 U.S. at p. 224 [48 L.Ed. at p. 158].)

[42]See *Sherbert* v. *Verner* (1963) 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790], and cases and commentators cited in 65 Cal.2d at pp. 504-507 & fns. 1-9.

them it cannot make them available in an obviously arbitrary way or exact a surrender of freedoms unrelated to the purpose of the facilities.' ''[43] ■ Accordingly, we may no longer question that state regulation of public employment must accord with the Fourteenth Amendment.

In *Takahashi* v. *Fish & Game Com.*, *supra*, 334 U.S. 410, the United States Supreme Court dealt a death blow to the "proprietary" rationale as a justification for exclusion of aliens from certain occupations. *Takahashi* involved a state statute which prohibited certain aliens[44] from fishing in California's coastal waters. The court conceded that the purpose of the law was the conservation of the fish, but held that a state could not constitutionally justify the exclusion of any or all of its resident aliens from employment as offshore fishermen upon the state's claim to ''ownership'' of the fish.[45]

The court in *Takahashi* formulated the requirement of strict judicial review of state statutes which discriminate against aliens as a class: The court noted that the Fourteenth Amendment guaranteed aliens the equal protection of the laws and the Congress has expressed a ''general policy that all persons lawfully in this country shall abide 'in any state' on an equality of legal privileges with all citizens under nondiscriminatory laws,'' and for this reason, ''the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits.'' (334 U.S. at p. 420 [92 L.Ed. at p. 1487].) *Takahashi*, therefore, confirms several developments in the law since the United States Supreme Court decided *Heim* v. *McCall*, *supra*, 239 U.S. 175. First, the court would employ a strict review of all state laws 'which classified persons on the basis of alienage; second, the court suggested by its holding that employment in a particular occupation was a significant, if not fundamental, interest entitled to special protection under the equal protection

---

[43]*American Communications Assn.* v. *Douds* (1950) 339 U.S. 382, 415, 417 [94 L.Ed. 925, 952, 953, 70 S.Ct. 674], Frankfurter, J., concurring and dissenting. Cited with approval in *Bagley* at 65 Cal.2d at page 506.

[44]The statute affected aliens ineligible for citizenship. Although the United States Supreme Court noted that under the then current naturalization laws this classification effected a racial or nationality discrimination, the court expressly refused to limit its holding to such facts. (334 U.S. at pp. 418, 421 [92 L.Ed. at pp. 1486, 1488].)

[45]The court held that to ''put the claim of the state upon title is to lean upon a slender reed,'' citing *Missouri* v. *Holland* (1920) 252 U.S. 416, 434 [64 L.Ed. 641, 648, 40 S.Ct. 382, 11 A.L.R. 984]. (334 U.S. at p. 421 [92 L.Ed. at p. 1488].)

clause;[46] and finally, by rejecting the state's asserted proprietary interest in its fish, the court cast doubt upon the legitimacy of this rationale in other cases, including the public employment area.

*Takahashi* thus warrants our rejection of the authority of *City of Pasadena* v. *Charleville, supra,* 215 Cal. 384, and of United States Supreme Court cases relied upon for that decision. The argument that the discrimination in the present case constitutes a minor deprivation involving relatively few jobs cannot be accepted; the power to discriminate in one field of public employment includes the power to discriminate in all fields. Perhaps when we decided *City of Pasadena* v. *Charleville* public employment constituted an insignificant portion of the total employment in the state. Today, however, public employment constitutes a broad spectrum of occupations, including a vast aggregate of jobs. We may not dismiss the discrimination of Labor Code section 1850 as insubstantial.

We hold that Labor Code section 1850 and related sections cannot stand. The discrimination involved denies arbitrarily to certain persons, merely because of their status as aliens, the right to pursue an otherwise lawful occupation. The classification within the statutory scheme operates irrationally without reference to any legitimate state interest except that of favoring United States citizens over citizens of other countries. This latter objective does not reflect such a compelling state interest that it would permit us to sustain this kind of discrimination. ■ Because section 1850 offends the equal protection clause of the Fourteenth Amendment to the United States Constitution, that section is hereby declared to be void.

To the extent that it conflicts with our present holding, we

---

[46]*Takahashi* thus extended the holding in *Truax* v. *Raich, supra,* 239 U.S. 33, 41 [60 L.Ed. 131, 135, 36 S.Ct. 7], which found "fundamental" the right to work for a living in the common occupations of the community.

Defendant argues that *Takahashi* does not govern the present case because the former decision rested on the state's exclusion of aliens from a whole occupation, whereas the present case merely restricts aliens from employment in the contract construction field to the extent that they might otherwise labor upon public works. First, *Takahashi* did not involve an entire occupation: aliens could fish beyond California's coastal waters. Second, the present case significantly restricts the alien's right to labor in the contract construction field because of the significant extent to which such labor occurs in public works. Thus, defendant may not distinguish *Takahashi* from the present case: the impact on the alien's right to pursue his chosen occupation is identical, most certainly in the case of persons such as civil engineers whose training and experience may render them unsuitable for employment other than upon public road construction.

overrule our decision in *City of Pasadena* v. *Charleville*, *supra*, 215 Cal. 384. We reject its language that "the right of any legislative body in this state to prohibit the employment of alien Chinese on public works may not be questioned. . . ." (215 Cal. at p. 398.) This statement, rendered in 1932, strikes a harsh and discordant note today. Its dissonance symbolizes the measure of our progress toward the goal that no man should suffer discrimination in employment because of the irrelevant circumstance of his birth.[47]

3. *Plaintiffs' exclusive remedy for the recovery of penalties consists of an action under Labor Code sections 1731-1733 against the awarding bodies of their respective contracts.*

The Treasurer has appealed from the default judgment taken by Purdy against her office and raises various procedural objections which have prompted us to consider the propriety of the judgments below insofar as they impose liability in damages for the assessed penalties against the Division of Labor Law Enforcement and the Treasurer. We have concluded that the judgments cannot stand as entered with respect to the award of damages.

Labor Code section 1732 provides that a contractor's "exclusive remedy" for the recovery of penalties assessed under section 1850 shall consist of an action against the awarding body of his contract to perform public work under sections 1731-1733. Under the circumstances of the present case, therefore, we cannot sustain a judgment which allows a contractor to recover such penalties directly against a party other than the awarding body of his contract.

Plaintiff Motshagen obtained a money judgment against the Division of Highways of the State Department of Public Works and the Division of Labor Law Enforcement of the State Department of Industrial Relations. We may uphold the judgment imposing damages against the Division of Highways, because that party was the awarding body of Motshagen's contract to perform public works. We must reverse the judgment in favor of Motshagen, however, to the extent that it imposed a money judgment against the Division of Labor Law Enforcement.

Plaintiff Purdy obtained a money judgment against the State Treasurer and the Division of Labor Law Enforcement. Neither of these parties was the awarding body of Purdy's

---

[47] "And if a stranger sojourn with thee in your land, ye shall not vex him. But the stranger that dwelleth with you shall be unto you as one born among you, and thou shalt love him as thyself." (Leviticus 19: 33, 34.)

contract. We cannot sustain the judgment, therefore, to the extent that it imposes damages against these two parties. On remand, plaintiff Purdy may seek to pursue his action, to the extent it remains available, against the San Diego Unified Port District, the awarding body of its contract to perform work upon the Spanish Landing project.[48]

The judgments are affirmed insofar as they declare Labor Code section 1850 and related sections void because they encroach upon the congressional scheme for immigration and naturalization and offend the equal protection clause of the Fourteenth Amendment. The judgment awarding plaintiff Motshagen damages for penalties assessed under these sections against the Division of Highways of the State Department of Public Works is affirmed. In all other respects, the judgments are reversed. The causes are remanded to the superior court for further proceedings consistent with this opinion. Respondents shall recover costs on appeal.

Traynor, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

---

[48]Purdy argues that the Division of Labor Law Enforcement collected the penalty and deposited the amount in the State Treasury, and thus an action against the Port District would prove fruitless since that body did not receive or retain the funds assessed. We cannot accept such an allegation in the absence of findings of fact by the trial court. Nevertheless, assuming such a fact were proved, Purdy still cannot maintain an action under Labor Code sections 1731-1733 against either the Division of Labor Law Enforcement or the State Treasurer. Its exclusive remedy to recover the penalty consists of an action against the Port District, the awarding body of its contract.

Under such circumstances, however, Purdy does not lack an effective remedy to recover the penalty. Labor Code sections 1727-1731 expressly provide that the awarding body alone shall receive such penalties and retain them until entry of final judgment in the action to recover the amount. Therefore, if the Division of Labor Law Enforcement and the State Treasurer did receive and now retain the penalty assessed against Purdy, they do so unlawfully, in direct violation of the code, which provides that the penalties assessed for Labor Code violations shall not enter the Treasury pending suit but shall remain with the awarding body. (Lab. Code, §§ 1730-1731.) Under such circumstances, mandamus would lie to compel the party wrongfully holding these funds to return them to the awarding body. (Code Civ. Proc., § 1085.)