[L.A. No. 29791. In Bank. Oct. 8, 1971.]

LEONARD J. BOGACKI, Plaintiff and Appellant, v.
BOARD OF SUPERVISORS OF RIVERSIDE COUNTY et al.,
Defendants and Respondents.

## COUNSEL

Tony Geram for Plaintiff and Appellant.

Ray T. Sullivan, Jr., County Counsel, and Tilden L. Brooks, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**SULLIVAN, J.**—Plaintiff Leonard J. Bogacki (hereinafter referred to as petitioner) appeals from a judgment denying a writ of mandate sought to compel respondents Board of Supervisors and Director of the Department of Building and Safety of the County of Riverside to set aside his allegedly wrongful dismissal from county employment, to reinstate him to his former position, and to restore him to all rights of county employment and reimburse him for lost compensation.

Prior to his dismissal petitioner, a permanent employee of the County of Riverside, held the position of building inspector in the county department of building and safety. On June 23, 1967, the department director (Director) sent to him a letter of termination which stated the following grounds for dismissal: "Insubordination to your superiors and misconduct of a nature that would reflect adversely upon the Department." Petitioner appealed to the county board of review, which concluded after hearing that the grounds stated in the letter of termination "are not sustained and on that basis there was not reasonable cause for dismissal." However, the board of review, for reasons which shall appear below, did not recommend petitioner's reinstatement to his former position; rather it recommended only that he "be restored to eligibility for future employment" with the county. Peti-

tioner then requested the county board of supervisors to reinstate him to his former position and reimburse him for lost compensation, but that request was denied. This action for a writ of mandate followed.

Throughout the period of petitioner's employment Riverside County had not adopted a civil service system. (See Gov. Code, § 31100 et seq.) Under the terms of ordinances and resolutions governing county employment its employees served at the pleasure of their department heads, subject to certain limited appeal rights. Thus, Ordinance No. 440 provided in relevant part: "Every officer shall appoint all necessary employees allowed or provided for his department by this ordinance and may demote or remove any employee of the department *without notice and for cause satisfactory to himself,* subject only to the provisions of this ordinance and requirements of law."[1] (Italics added.)

Resolution No. 440-805, which was passed pursuant to a section of Ordinance No. 440 authorizing the promulgation of dismissal review procedures by the board of supervisors, set up separate procedures for probationary and permanent employees.[2] The provisions dealing with permanent employees provided in general that when dismissing a permanent employee

---

[1] Other portions of Ordinance No. 440 relating to employment procedures provided that officers might appoint as employees only those persons certified as eligible for the particular position by the personnel director; that officers might appoint "deputies" from among their employees; that a written termination of employment signed by an employing officer should be filed with the personnel director, giving the date of termination and the reason therefor; and that a termination of employment should automatically terminate an appointment as deputy.

[2] Resolution No. 440-805 provided in full: "BE IT RESOLVED by the Board of Supervisors of the County of Riverside, State of California, in regular session assembled on March 25, 1963, pursuant to subsection K of section 3 of Ordinance No. 440, that Resolution No. 440-776, adopted January 2, 1963, is rescinded and the following is substituted therefor:

"1. *Probation Period*

"Every employee entering the county service by appointment to a regular position in the classified service shall be required to serve a probation period of one year from the date of appointment. An employee with permanent status who is promoted shall serve a probation period of 6 months in the position to which he has been promoted dating from the date of such promotion. The granting of any leave of absence without pay exceeding 11 working days shall cause the employee's probation period to be extended by the number of calendar days for which such leave of absence has been granted. The probation period for a person entering the service as a seasonal employee shall be 240 working days provided that one year shall not have elapsed since the original date of appointment. The probationary provisions applying to the promotion of an employee in the seasonal category is identical to that for regular fulltime employees except that the period shall be 120 working days within a year. Temporary employees are not considered to have a probation period and do not achieve permanent status. A probationary employee may be separated from the service at any time during the probation period without privilege of review or hearing. Notwithstanding any of the provisions of this section, an employee rejected during the probation period from a position in the classified service to which he has been promoted may be restored to the position from which he was promoted. Such

the department head must direct a letter to the employee stating the cause for dismissal; that the "employee dismissed" might within 14 days file with the personnel director a written answer to the letter of dismissal; that within 20 days after filing of the answer the review board should hold a hearing wherein both the employee and the department head should "have the privilege to be heard and present evidentiary facts"; that within seven days after the hearing the review board *"shall . . . make a written finding as to whether or not the employee was dismissed for reasonable cause and shall also make a recommendation as to the eligibility of the employee for future employment"* with the county; that a copy of the finding should be trans-

restoration is not mandatory, but at the discretion of the department head within the limits of available authorized positions.

"2. *Hearing Procedure*

"A permanent employee shall have the following privileges concerning his discharge or dismissal:

"(a) Notice of Dismissal. In dismissing a permanent employee the department head shall immediately direct a letter to the employee specifically stating the cause or causes for dismissal. The letter shall be delivered to the employee personally if he is present; otherwise, it shall be mailed to him at his last known address. A copy of the letter shall be promptly furnished to the Personnel Director, accompanied by a statement signed by the department head that the original was delivered to the employee, or that it was mailed to him, giving the address, and the date on which it was mailed or delivered. This copy shall be available to the Review Board upon request.

"(b) Review Board. The Review Board shall include the following members: an elective department head appointed by the Board of Supervisors, an appointive department head appointed by the Board of Supervisors, the County Administrative Officer, the General Manager of the Riverside County Employees Association, a member of the Riverside County Employees Association appointed by the Board of Directors of the Association, and the Personnel Director who shall be a non-voting member and secretary of the Review Board and shall keep its records. Three members shall constitute a quorum, and three affirmative votes shall be necessary for any action.

"(c) Answer. The employee dismissed may, within 14 calendar days after service on him or mailing to him of the letter of dismissal, file with the Personnel Director an answer in writing to the letter of dismissal. The Personnel Director shall forthwith transmit said letter and answer to the Review Board for hearing. The Review Board shall within 20 calendar days from the filing of the answer commence the hearing, and shall notify the interested parties of the time and place of hearing at least 7 calendar days in advance thereof.

"(d) Hearing and Decision. Upon such hearing, both the replying employee and the department head whose action is reviewed shall have the privilege to be heard and present evidentiary facts. At such hearing, technical rules of evidence shall not apply. The Review Board shall, within 7 calendar days after the hearing, make a written finding as to whether or not the employee was dismissed for reasonable cause and shall also make a recommendation as to the eligibility of the employee for future employment with the County of Riverside. A copy of the written finding and recommendations of the Review Board shall be transmitted to the department head, the employee and the Personnel Director. The Review Board shall transmit, immediately after filing its findings, all of the records in the matter to the Personnel Director for filing. The Personnel Director shall restore the employee's eligibility for employment in appropriate classifications of the county service where qualified if the Review Board so recommends. Any action or decision made hereunder shall be final and not subject to judicial review."

mitted to the employee, the department head, and the personnel director; that the personnel director *"shall restore the employee's eligibility for employment in appropriate classifications of the county service where qualified if the Review Board so recommends"*; and that the decision of the review board should not be subject to judicial review. (Italics added throughout.) Resolution No. 440-805 gives the review board no power to reinstate or recommend reinstatement of a dismissed employee.

In his first amended petition for a writ of mandate petitioner alleged that he had performed his work competently and diligently at all times during his employment. He also alleged facts relating to his membership and activities in an organization known as the Construction Inspectors Association of Southern California (Association), an organization allegedly devoted to improving the skill and professional competency of building inspectors, and —alleging that the Director of the department of building and safety was inimical to this organization and resented petitioner's activities therein— detailed several occasions on which this hostility had been made manifest by complaints and outright threats to petitioner's job.

The petition then went on to allege generally as follows a series of incidents which led to petitioner's dismissal: (1) At a meeting with petitioner in May of 1967 the Director reluctantly granted petitioner a step increase in pay, having initially refused to do so. At this meeting the Director charged that petitioner was incompetent and unprofessional in his work, but he also "revealed his continuing hostility to petitioner because of petitioner's continued activity in the [Association]"; the Director then "warned petitioner that [he] would be on probation for six months, implying that [petitioner] would have to refrain from his activities and membership in the [Association] if petitioner were to avoid dismissal from his work." (2) In June of 1967 a number of contractors who had learned of petitioner's difficulties with the Director prepared, signed and sent to several members of the board of supervisors "a written statement indicating that their personal experience with petitioner had shown him to be a highly competent building inspector who conscientiously performed his duties as such . . . ." (3) "[A]fter learning of said statement by contractors on behalf of petitioner, [the Director], utilizing said statement as a pretext, and motivated by his long standing hostility to petitioner for his membership and active participation in the [Association]," dismissed petitioner from his employment by means of the letter of termination which, as we have indicated, stated as grounds for dismissal "Insubordination to your superiors and misconduct of a nature that would reflect adversely upon the Department."

After recounting petitioner's appeal to the review board and the finding and recommendation of that body, the petition went on to allege that peti-

tioner was not qualified for positions in county departments other than the department of building and safety; that the effect of the review ·board's recommendation placing. him on the eligibility list for future employment rather than reinstating him afforded him no relief; and that he has been neither employed nor offered employment by the county since the decision of the review board.

Finally, the petition alleged that petitioner's dismissal was (1) in violation of his right to free speech and assembly as guaranteed by the state and federal Constitutions "in that he was discharged by [the Director] because of petitioner's membership and activity, including verbal solicitation in a · lawful manner on his own time of membership in the [Association] . . . ." and (2) "arbitrary and capricious and without just cause, and therefore in violation of the Fourteenth Amendment to the U. S. Constitution, in that it deprived petitioner of property without due process of law, namely his loss of his position as building inspector and the stigma it has created as to his professional competency in this field of endeavor in which he has been qualified and skilled for many years."

An alternative writ issued, respondents filed a return, and there was a full trial on the merits.[3] The decision of the trial court is reflected as follows in the clerk's minutes:[4] "In this matter heretofore heard and submitted, the Court finds that [plaintiff] has.not carried the burden of proving that his discharge was ·due to his activities in the Construction Inspector's Assoc. of Southern California. [Par.] Accordingly, the alternative writ of mandate is discharged, the application for a peremptory writ is denied and the petition is dismissed. [Par.] The Court withholds any opinion concerning whether mandate would otherwise be available in the event of arbitrary discharge from county employment, such issue not having been raised by the petition. . . ."[5] Petitioner appeals from the judgment.

 It is now well-settled that even a probationary public employee or one serving at the pleasure of the appointing authority may not be dismissed from his employment for the exercise of constitutional rights absent a showing that the restraints which the employing body would impose on those rights are justified by a compelling public interest. (*Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 503-505 [55 Cal. Rptr. 401, 421 P.2d 409]; *Rosenfield* v. *Malcolm* (1967) 65 Cal.2d 559, 562-563 [55 Cal.Rptr. 505, 421 P.2d 697]; *Ball* v. *City Council* (1967)

[3]Six witnesses testified for petitioner at trial; five witnesses testified for respondents.
[4]The trial court's announcement of the decision does not appear in the transcript of the oral proceedings.
[5]In its formal findings the trial court listed as a conclusion of law: "The plaintiff has not carried the burden of proving that his discharge was due to his activities in the Construction Inspectors Association of Southern California."

252 Cal.App.2d 136, 141 [60 Cal.Rptr. 139]; see also, *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331 [38 Cal.Rptr. 625, 392 P.2d 385]; cf. *Hollon* v. *Pierce* (1967) 257 Cal.App.2d 468, 478, fn. 4 [64 Cal.Rptr. 808] and accompanying text.) ■ It is equally clear, however, that such an employee bears the burden of showing that he was in fact dismissed because he exercised constitutional rights in defiance of restraints sought to be placed by the employing agency. (*Stanton* v. *Dumke* (1966) 64 Cal.2d 199, 205-207 [49 Cal.Rptr. 380, 411 P.2d 108].) In the absence of such a showing the courts will not intervene. (See *Rosenfield* v. *Malcolm, supra,* 65 Cal.2d 559, 563-564.)

■ As we have indicated, petitioner sought to show at trial that he was dismissed because of his activities with the Association, but the trial court found to the contrary. (Cf. *Ball* v. *City Council, supra,* 252 Cal.App.2d 136.) Petitioner's contention that that finding lacked substantial support in the evidence[6] is clearly without merit. The Director testified at trial that he had no objection to the Association or to petitioner's activities therein on his own time; that he in fact encouraged employee participation in the Association; and that petitioner was dismissed for unsatisfactory work performance.

■ Petitioner further urges, however, that although the record may support the trial court's finding that his Association activities were not the cause of his dismissal, it also shows that the dismissal was triggered by his exercise of his First Amendment right to free speech. We are directed to portions of the trial record which indicate that the dismissal occurred subsequent to, and as a result of, the testimonial letter sent by local contractors to members of the board of supervisors after petitioner had discussed his job difficulties with one of them.

However, the pleadings and the trial transcript reveal that this theory is raised for the first time on appeal. As we have indicated, the contractors' letter and the circumstances surrounding it were mentioned in the petition for mandate—but only in support of the theory relating to petitioner's Association activities. Thus it was alleged that the letter was used as a "pretext" by the Director, whose real motivation for the dismissal was petitioner's Association activities. Similarly the trial transcript contains no sugges-

---

[6]Although the finding in question was placed among the court's conclusions of law in the formal findings (see fn. 5, *ante*), it was clearly a finding of ultimate fact and will be so regarded. (See *Linberg* v. *Stanto* (1931) 211 Cal. 771, 776 [297 P. 9, 75 A.L.R. 555]; *Rees* v. *Department of Motor Vehicles* (1970) 8 Cal.App.3d 746, 749 [87 Cal.Rptr. 456]; *Petersen* v. *Cloverdale Egg Farms* (1958) 161 Cal.App.2d 792, 797 [327 P.2d 127].)

tion that petitioner in any way based his claimed right to reinstatement upon the infringement of his First Amendment right to discuss his employment difficulties with others. (See fn. 8, *infra.*) No findings were made as to any causal relationship between petitioner's dismissal and the contractors' letter or the events which precipitated it.[7] Moreover, petitioner did not object to the findings or request specific findings on the issue he now seeks to raise.

■ The general rule that a legal theory may not be raised for the first time on appeal is to be stringently applied when the new theory depends on controverted factual questions whose relevance thereto was not made to appear at trial. (*Panopulos* v. *Maderis* (1956) 47 Cal.2d 337, 340-341 [303 P.2d 738].) ■ Here there was testimony concerning an admonition by the Director to petitioner that he not discuss his job difficulties with others, and there was also testimony which related in a very general way petitioner's conversation with one of the contractors which led to the letter, but petitioner at no time prior to appeal attempted to relate this evidence to a contention such as that he now advances.[8] As a result respondents made no effort to develop the factual areas in question. In these circumstances petitioner may not now raise the theory that his dismissal resulted from the exercise of his right to free speech.

Petitioner urges that we should exercise our power under section 909 of the Code of Civil Procedure[9] (formerly § 956a) and make a finding of fact

---

[7]The court's findings, through selective incorporation of the allegations of the petition, determine only that the dismissal occurred "after" the Director learned of the contractors' letter. Petitioner's attempt to impeach the formal findings by reference to certain tentative remarks of the trial court suggesting a causal relationship must fail. (*Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d 803, 825 [25 Cal.Rptr. 798].)

[8]Petitioner asserts that he raised the contention at oral argument prior to submission of the case to the court. However, that argument was apparently not reported and is not a part of the record before us. We therefore do not consider this point. (See *Van Cise* v. *Lencioni* (1951) 106 Cal.App.2d 341, 349-350 [235 P.2d 236].)

[9]Section 909 provides: "In all cases where trial by jury is not a matter of right or where trial by jury has been waived, the reviewing court may make findings of fact contrary to or in addition to those made by the trial court. Such findings may be based on the evidence adduced before the trial court either with or without the taking of evidence by the reviewing court. The reviewing court may for the purpose of making such findings of fact or for any other purpose in the interests of justice, take additional evidence of or concerning facts occurring at any time prior to the decision of the appeal, and may give or direct the entry of any judgment or order and may make such further or other order as the case may require. This section shall be liberally construed to the end among others that, where feasible, causes may be finally disposed of by a single appeal and without further proceedings in the trial court except where in the interests of justice a new trial is required on some or all of the issues."

to the effect that he was dismissed because of the contractors' letter and his conversation with the contractor which preceded it. Suffice it to say that we decline to exercise our power under section 909 in a case such as this to find facts supportive of a theory not raised at trial and presented for the first time on appeal.

Petitioner finally urges that his dismissal was arbitrary, in violation of county law, and in violation of his constitutional right not to be deprived of "property" without due process of law. Two interrelated contentions are made by petitioner under this heading.

First it is contended that county law impliedly invests the review board, upon a finding that there was no reasonable cause for dismissal, with the power to recommend reinstatement. This contention is clearly refuted by subdivision 2(d) of Resolution No. 440-805, which we have set forth in footnote 2, *ante*, as well as by Ordinance No. 440 itself, which is set forth in relevant part in the text accompanying footnote 1, *ante*. Read together, these provisions of county law clearly provide that a county employee may be dismissed from his position without notice and for cause satisfactory to his department head, but that if, on appeal to the review board, it is determined that there was no reasonable cause for dismissal, the review board may make a binding recommendation that the employee be *restored to eligibility for future employment*. The applicable provisions give the review board absolutely no power to reinstate the employee in the position from which he was dismissed. In brief, the department head is given *an absolute power of dismissal,* with a limited power in the review board to restore a dismissed employee to eligibility for future county employment.

It is upon this foundation that petitioner seeks to erect his constitutional argument. As we understand it the argument is that an absolute power of dismissal pertaining to public employees is forbidden by due process insofar as it permits a dismissal that is "arbitrary and capricious and without just cause"; that a dismissal pursuant to such a power is "arbitrary and capricious and without just cause" unless it is shown by substantial evidence that there was a valid reason for dismissal; that the record in this case fails to show by substantial evidence that there was a valid reason for petitioner's dismissal; that the trial court's finding that petitioner's dismissal was *not* "arbitrary and capricious and without just cause" was therefore unsupported;[10] and that the dismissal was therefore in violation of petitioner's constitutional rights.

---

[10]The trial court found untrue the allegation in the petition that petitioner's dismissal "was arbitrary and capricious and without just cause, and therefore in violation of the Fourteenth Amendment . . . ."

Petitioner correctly points out that the record as a whole fails to establish any specific reason for his dismissal. Although two grounds for dismissal were assigned by the Director in his letter of termination (insubordination and conduct reflecting adversely upon the department), neither finds concrete support in the record. Thus, the Director testified in general that he equated poor work performance with insubordination,[11] but the trial court specifically found that petitioner performed his work competently at all times. There was no specific evidence adduced as to conduct reflecting adversely upon the department.

The question remains, however, whether the fact that the record fails to establish a specific cause for dismissal is pertinent to this proceeding.

■ The major premise of petitioner's argument is that a public employee, even though under the terms of his employment he serves at the pleasure of the appointing authority, may not be dismissed without judicially cognizable good cause. On its face this proposition is contrary to numerous authorities which hold that such an employee may be terminated without cause and without notice or hearing. (See *Ball* v. *City Council, supra*, 252 Cal.App.2d 136, 141, and cases there cited.) It is true, of course, that the rule which these authorities announce has been qualified by the principle, discussed above, that public employment—even that of a probationary employee or one serving at the pleasure of the appointing authority—may not be conditioned upon a waiver of constitutional rights absent a showing of compelling public interest, and that dismissal for the exercise of such rights absent the requisite showing of public interest is in violation of constitutional guarantees. (See *Bagley* v. *Washington Township Hospital Dist., supra*, 65 Cal.2d 499; *Ball* v. *City Council, supra*, 252 Cal. App.2d 136, 141, and other cases cited, *ante*.) However, it is quite another thing to assert—as petitioner does—that even when a *dismissed employee* serving at the pleasure of the appointing authority fails to show that his dismissal resulted from the exercise of a constitutional right, he nevertheless has the right to be reinstated to his employment unless *the appointing authority* is able to demonstrate judicially cognizable good cause for dismissal. This would be tantamount to saying that a public agency *cannot employ* persons subject to removal at *its* pleasure, for if judicially cognizable good cause is requisite to removal in all cases there can be no wholly subjective power of removal in the agency.[12]

---

[11]The Director specifically denied that he considered petitioner's conversation with the contractor which resulted in the contractors' letter an instance of insubordination.

[12]The record in this case is illustrative. The Director testified that his primary reason for dismissal was unsatisfactory and incompetent inspection work by petitioner. The trial court, however, found that petitioner's work was competent during

Such is not the law in California, nor has it ever been. A public employee serving at the pleasure of the appointing authority—whether he be a "permanent" employee in a non-civil-service county as in this case, a "provisional" employee in a civil service county (see *Rosenfield* v. *Malcolm, supra,* 65 Cal.2d 559), or any other kind of public employee serving on this basis—is by the terms of his employment subject to removal without judicially cognizable good cause. "Unquestionably, a broad discretion reposes in governmental agencies to determine which [such] employees they will retain. Considerations of comity and administrative efficiency counsel the courts to refrain from any attempt to substitute their own judgment for that of the responsible officials." (*Rosenfield* v. *Malcolm, supra,* 65 Cal. 2d 559, 562-563.) Only when such a public employee can show that his employment has been unjustifiably conditioned on the waiver of his constitutional rights will the courts intervene and give relief. (See *Stanton* v. *Dumke, supra,* 64 Cal.2d 199, 205-207.)

Despite certain broad language in *Fort* v. *Civil Service Commission, supra,* 61 Cal.2d 331, 334, and *Hollon* v. *Pierce, supra,* 257 Cal.App.2d 468, 478, those decisions are in no way contrary to what we have said today. In *Fort* the petitioner clearly showed that dismissal resulted from his violation of a section of the county charter which impinged upon his constitutional right to engage in political activity. In *Hollon* the employee was subject to removal only for cause.

■ In the instant case the system of county employment vested in various department heads the power to dismiss their employees without notice and for cause satisfactory to the particular department head. A review procedure was also provided, but that procedure contemplated only that if the dismissal were considered unjustified by the review board that body could recommend that the dismissed employee be made eligible for future county employment. The power of a department head to remove from his particular department an employee deemed unsuitable by him was absolute within the terms of applicable county law. Petitioner, being dismissed from a particular department but restored to eligibility by the review board, sought a writ of mandate ordering reinstatement on the theory that he was dismissed because of the exercise of his constitutional right to freedom of association. The trial court found on the basis of substantial evidence that that was not

the period of his employment. If judicially cognizable good cause were requisite to dismissal, and petitioner could therefore claim reinstatement on the basis of the trial court's finding, the Director would be required to accept as an employee one whom he personally considered incompetent solely because the trial court disagreed with him on that point. Clearly, the Director's power to remove "for cause satisfactory to himself" would have become chimerical.

the cause of dismissal. The department head's dismissal of petitioner must therefore stand.

The judgment is affirmed.

Wright, C. J., McComb, J., Mosk, J., and Burke, J., concurred.

**TOBRINER, J.**—I dissent.

After working six years as a building inspector of the County of Riverside, petitioner Leonard Bogacki was dismissed from his employee status by his supervisor, on the ostensible ground of "insubordination." Contending that his discharge was unjustified, Bogacki appealed his termination to the county board of review, an administrative body established by county resolution specifically to review the discharge or dismissal of all permanent employees. After a hearing was held on the circumstances of Bogacki's dismissal, the review board concluded that the stated grounds for dismissal were not supported by the facts and that there was no reasonable cause for petitioner's dismissal.

Petitioner's "success" before the review board, however, is now revealed as a totally Pyrrhic victory, for the majority read the governing resolution as granting the board no authority to provide effective relief for an improper dismissal. Under the majority's interpretation, the review board may only declare petitioner eligible for future county employment, and may not restore him to the position from which he was improperly removed. Placement on an eligibility list, however, is in reality a futile gesture for petitioner, because the supervisor who dismissed Bogacki remains the sole person capable of offering him reemployment. The same unsupported—perhaps capricious—considerations which led to Bogacki's dismissal are thus likely to foreclose his chances for reemployment with the county in perpetuity. The hearing which petitioner was granted before the review board is thus reduced to a largely meaningless procedure, and although there is apparently no factual basis for petitioner's discharge, he is denied reinstatement to his former position.

The majority sanction this dismissal of a permanent public employee without a meaningful hearing and on totally unsubstantiated facts on the basis of a county ordinance which provides that a supervisor "may . . . remove any employee of the department *without notice and for cause satisfactory to himself,* subject only to the provisions of this ordinance *and requirements of law."* (Italics added.) Evidently, in the majority's view, "requirements of law" place no limits on the arbitrary and summary dismissal of an employee by a public official.

Nearly a century ago, however, in a case also involving the withdrawal of an occupational opportunity by the government, the United States Supreme Court declared in unambiguous terms that the federal Constitution "do[es] not . . . leave room for the play and action of purely personal and arbitrary power. . . . [T]he very idea that one man may be compelled to hold . . . any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails. . . ." (*Yick Wo* v. *Hopkins* (1886) 118 U.S. 356, 370 [30 L.Ed. 220, 226, 6 S.Ct. 1064].) And on numerous occasions over the past decade this court itself has reiterated that "[I]t is settled that a person cannot properly be barred or removed from public employment *arbitrarily* or in disregard of his constitutional rights" (e.g., *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331, 334 [38 Cal.Rptr. 625, 392 P.2d 385]).

Moreover, a host of recent decisions of both the United States Supreme Court and this court establish the constitutional necessity of providing at least the minimal procedural safeguard of a meaningful hearing in a variety of circumstances in which government action causes significantly less harm than the loss of a permanent job. (*Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337, 339 [23 L.Ed.2d 349, 352, 89 S.Ct. 1820] (wage garnishment); *Bell* v. *Burson* (1971) 402 U.S. 535 [29 L.Ed.2d 90, 91 S.Ct. 1586] (suspension of driver's license); *Blair* v. *Pitchess* (1971) *ante,* p. 258 [96 Cal.Rptr. 42, 486 P.2d 1242] (replevin of personal property); *Randone* v. *Appellate Department* (1971) *ante,* p. 536 [96 Cal.Rptr. 709, 488 P.2d 13] (attachment of property).) To read the due process clause as requiring a meaningful hearing when the government sanctions the repossession of a refrigerator (see *Blair* v. *Pitchess* (1971) *supra, ante,* pp. 258, 279), but not when the government dismisses a permanent employee is to foster a peculiar set of constitutional priorities far removed from the realities of the day. And this interpretation is particularly anomalous in light of the special protection that California courts have traditionally afforded individuals when their employment opportunities have been curtailed. (See, e.g., *Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134 [231 P.2d 6, 21 A.L.R.2d 1387]; *Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160 [81 Cal.Rptr. 623, 460 P.2d 495]; *Kronen* v. *Pacific Coast Society of Orthodontists* (1965) 237 Cal.App.2d 289 [46 Cal.Rptr. 808].)

The instant case thus presents two issues of substantial constitutional significance in the field of public employment which the majority, in my view, resolve incorrectly. The initial question is whether the due process clause places any limits on the authority of a government employer to dis-

miss an employee arbitrarily; the majority conclude that the Constitution does not, and in so holding undermines the due process clause's basic claim to guarantee a government of laws and not of men. The second question is whether the due process clause protects a permanent public employee from the loss of his employment without the minimal procedural due process right of a meaningful hearing; again, the majority answers in the negative, in spite of a rapidly burgeoning trend of contrary constitutional precedent.

In choosing to "reaffirm" early constitutional decisions which irrationally carved the field of public employment out of the reach of the due process clause—cases founded upon the discredited "right-privilege" approach to constitutional adjudication—the majority ignore the major developments in due process decisions over the past two decades. As explained more fully below, I believe that in light of the relevant constitutional considerations, Riverside County Resolution No. 440-805 must be construed to permit the review board to reinstate a permanent employee, like petitioner, who the board finds, after a hearing on the merits, to have been discharged arbitrarily.

*1. Although the government, as employer, retains considerable discretion in determining whether to dismiss public employees, the due process clause limits governmental authority to dismiss permanent employees arbitrarily.*

County ordinance No. 440 provides in relevant part that "Every officer . . . may . . . remove any employee of the department without notice and for cause satisfactory to himself, subject only to the provisions of this ordinance and requirements of law." The initial question which we address is whether "requirements of law," specifically the due process clause of our state and federal Constitutions (Cal. Const., art. I, § 13; U.S. Const., Amend. XIV), places any limits on the government's power to discharge a permanent public employee *arbitrarily*. As the majority fully recognize (majority opn., *ante*, p. 781), on the present record Mr. Bogacki's dismissal appears to have been based on totally unfounded grounds; although his supervisor justified the discharge on grounds of "insubordination," the review board found that charge factually unsupported and both the review board and the trial court concluded that Bogacki was fully competent for the position from which he was dismissed.

Thus, we have before us a discharge that can claim no evidentiary support in the present record; under traditional legal terminology, such a discharge is unquestionably "arbitrary." "Action is arbitrary not only

when it is capricious, but also if it lacks adequate support in the record, when the facts do not justify the conclusion." (*Hollon* v. *Pierce* (1967) 257 Cal.App.2d 468, 478 [64 Cal.Rptr. 808]; see, e.g., *Thompson* v. *City of Louisville* (1960) 362 U.S. 199 [4 L.Ed.2d 654, 80 S.Ct. 624]; *Schware* v. *Board of Bar Examiners* (1957) 353 U.S. 232 [1 L.Ed.2d 796, 77 S.Ct. 752].)

Although the majority purportedly recognize that the Constitution limits the government's power to discharge a public employee for an "unconstitutional reason," they perceive no constitutional impediment to the totally arbitrary exercise of this governmental authority. Under the majority's analysis, placement of a public employee's continued employment under the "absolute" and "unfettered" discretion of a government supervisor, where dismissal even at the mere "whim" of the supervisor is unchallengeable is entirely compatible with constitutional strictures.

The due process clause of the Constitution stands, however, as a fundamental challenge to the majority's conclusion. Historically, a primary purpose of the "due process" clause was to circumscribe the government's power to utilize its authority arbitrarily. As early as 1819 the United States Supreme Court acknowledged that the due process clause was "intended to secure the individual from the arbitrary exercise of the power of government" (*Bank of Columbia* v. *Okely* (1819) 17 U.S. (4 Wheat.) 235, 244 [4 L.Ed. 559, 561]) and despite numerous changes in the court's composition and judicial philosophy throughout our nation's history, the Supreme Court has consistently maintained that "there is no place in our constitutional system for the exercise of arbitrary power. . . ." (*Garfield* v. *United States* ex rel. *Goldsby* (1908) 211 U.S. 249, 262 [53 L.Ed. 168, 175, 29 S.Ct. 627].)[1] Justice Cardozo, writing for a unanimous court in *Ohio Bell Telephone Co.* v. *Public Utilities Com.* (1937) 301 U.S. 292, 302 [81 L.Ed. 1093, 1100, 59 S.Ct. 724], characterized the essence of due process as "the protection of the individual against arbitrary action."

The majority do not challenge the fundamental proposition that the "due process" clause, where applicable, precludes arbitrary governmental action; in finding that "*an absolute power of dismissal*" (majority opn.,

---

[1]See, e.g., *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356, 369 [30 L.Ed. 220, 226, 6 S.Ct. 1064]; *Dent* v. *West Virginia* (1889) 129 U.S. 114, 124 [32 L.Ed. 623, 626, 9 S.Ct. 231]; *ICC* v. *Louisville & Nash. RR* (1913) 227 U.S. 88, 91 [57 L.Ed. 431, 433, 33 S.Ct. 185]; *Meyer* v. *Nebraska* (1923) 262 U.S. 390, 399-400 [67 L.Ed. 1042, 1045-1046, 43 S.Ct. 625]; *Nebbia* v. *New York* (1934) 291 U.S. 502, 539 [78 L.Ed. 940, 958, 54 S.Ct. 505]. See generally Berger, *Administrative Arbitrariness: A Synthesis* (1969) 78 Yale L.J. 974, 980-984.

*ante,* p. 781 (original italics)) in a government official is compatible with constitutional requirements, however, the majority necessarily have determined, albeit *sub silentio,* that the "due process" clause is not applicable to the discharge of public employees. Although the majority suggest no reason why this particular constitutional protection, as distinguished from all other constitutional rights, may be totally withheld from public employees, the majority apparently view their conclusion as simply a restatement of settled constitutional principles. In my view, however, a careful review of the applicable constitutional decisions reveals that the "settled principle" relied on by the majority has been substantially eroded over the past two decades.

Historically, the doctrine that the protections of the due process clause are not applicable to the discharge of public employees emerged from a series of cases which viewed the status of public employment as a mere "privilege" rather than a matter of constitutional "right." This line of cases,[2] epitomized by Justice Holmes' renowned epigram in *McAuliffe* v. *Mayor of New Bedford* (1892) 155 Mass. 216, 220 [29 N.E. 517],[3] reasoned that since an individual had no "right" to demand that the government employ him, the status of "public employee" was one that had been granted by the government as a matter of "grace," and one which could, in the absence of statutory limitations, accordingly be withdrawn "at the pleasure" of the state. It is this series of cases on which the majority's conclusion inescapably rests.

The past 20 years of constitutional adjudication, however, have been devoted in no small part to discrediting and disavowing the "right-privilege" mode of decision-making adopted by these earlier cases. (See generally Van Alstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law* (1968) 81 Harv.L.Rev. 1439.) The modern decisions, recognizing that the "right-privilege" distinction in reality affords no persuasive reasoning but simply embodies a legal conclusion, have uniformly discarded this talismanic formula, and have recognized that constitutional provisions constitute a *general* limit on governmental action, whether that action involves the withdrawal of "government largess" or a

---

[2]E.g., *Barsky* v. *Board of Regents* (1954) 347 U.S. 442, 451 [98 L.Ed. 829, 839, 74 S.Ct. 650]; *Adler* v. *Board of Education* (1952) 342 U.S. 485, 492 [96 L.Ed. 517, 524, 72 S.Ct. 380, 27 A.L.R.2d 472]; *Bailey* v. *Richardson* (1950) 182 F.2d 46, 59 [86 App.D.C. 248], affd. by an equally divided court (1951) 341 U.S. 918 [95 L.Ed. 1352, 71 S.Ct. 669].

[3]"Petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman."

more traditional exercise of governmental regulations.[4] As this court explicitly recognized in *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 500-504 [55 Cal.Rptr. 401, 421 P.2d 409], the reasoning of the "privilege" cases "today stands utterly discredited. Although an individual can claim no constitutional right to obtain public employment or to receive any other publicly conferred benefit, the government cannot condition admission to such employment or receipt of such benefits upon any terms that it may choose to impose . . . . Today courts and commentators alike recognize without question that the power of government, federal or state, to withhold benefits from its citizens does not encompass a supposed 'lesser' power to grant such benefits upon an arbitrary deprivation of constitutional right."

The majority, of course, are obviously not oblivious to this line of cases; the initial portion of their opinion specifically recognizes the force of these decisions in limiting the government's authority to discharge an employee for exercising a specific constitutional right, such as the right of free speech. The majority fail to recognize, however, that by discrediting the entire "privilege" approach to constitutional adjudication and by establishing the applicability of constitutional restrictions to all forms of governmental activity, this developing series of decisions also brings into play the due process clause's substantive protection against "arbitrary" governmental action. (See generally O'Neill, *Justice Delayed and Justice Denied,* 1970 Sup.Ct. Rev. 161, 203-207.)

Thus, although the majority apparently purport to be merely reaffirming settled law by ratifying a "wholly subjective" governmental authority to discharge employees, they overlook a number of decisions in both the United States Supreme Court and in this court, reaching back nearly 20 years, which, after rejecting the "right-privilege" analysis of early cases, have explicitly recognized that the due process clause proscribes arbitrary exclusions and dismissals[5] from public service.

---

[4]See, e.g., *Bell* v. *Burson* (1971) 402 U.S. 535 [29 L.Ed.2d 90, 91 S.Ct. 1586, 1589] (suspension of driver's license); *Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011] (termination of welfare benefits); *Sherbert* v. *Verner* (1963) 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790] (disqualification for unemployment compensation); *Speiser* v. *Randall* (1958) 357 U.S. 513 [2 L.Ed.2d 1460, 78 S.Ct. 1332] (denial of a tax exemption); *Dixon* v. *Alabama State Board of Education* (5th Cir. 1961) 294 F.2d 150, cert. den. 368 U.S. 930 [7 L.Ed.2d 193, 82 S.Ct. 368] (expulsion from public university); *Escalera* v. *New York City Housing Authority* (2d Cir. 1970) 425 F.2d 853, 861, cert. den. 400 U.S. 853 [27 L.Ed.2d 91, 91 S.Ct. 54] (eviction from public housing).

[5]In condemning arbitrary governmental action, the cases to be discussed *infra* draw no distinction between the *exclusion* of potential employees and the *discharge* of actual employees (*Wieman* v. *Updegraff* (1952) 344 U.S. 183 [97 L.Ed. 216, 73 S.Ct. 215] (exclusion); *Slochower* v. *Board of Education* (1956) 350 U.S. 551 [100 L.Ed. 692, 76 S.Ct. 637] (discharge); *Wilson* v. *City of Los Angeles* (1960) 54

*Wieman* v. *Updegraff* (1952) 344 U.S. 183 [97 L.Ed. 216, 73 S.Ct. 215] represents the initial decision of this sequence. In a series of cases prior to *Wieman,* the court had affirmed the right of states to dismiss employees who had been found to advocate the overthrow of the government by unlawful means, or who refused to answer inquiries relating to "matters that may prove relevant to their fitness and suitability for the public service." (*Adler* v. *Board of Education* (1952) 342 U.S. 485 [96 L.Ed. 517, 72 S.Ct. 380, 27 A.L.R.2d 472]; *Garner* v. *Los Angeles Board* (1951) 341 U.S. 716 [95 L.Ed. 1317, 71 S.Ct. 909].) In *Wieman,* however, a public employee had been dismissed by the state merely for refusing to sign a loyalty oath which required him to swear to present and past *nonmembership* in the Communist Party or in any Communist front organization; the state automatically excluded all such members from public service, regardless of whether they knew of the anti-government activity of their organization or had actually partaken in such activity.

Although the state argued that its right to condition public employment on such conditions followed from its broad authority over employees which the court had seemingly recognized in its earlier decisions,[6] the *Wieman* court first carefully distinguished the prior cases as involving conditions on employment which had some rational relation to the employee's fitness for public service, and then concluded that an employee's mere membership in an organization had no such relevance to his fitness for public employment, because the membership could as reasonably be "innocent" as "guilty." (344 U.S. at p. 191 [97 L.Ed. at p. 222].) The court declared: "Indiscriminate classification of innocent with knowing activity must fall as an assertion of *arbitrary* power. The oath offends due process." (Italics added.) (344 U.S. at p. 191 [97 L.Ed. at p. 222].)

In concluding, the *Wieman* court made its holding that the due process clause prohibits the arbitrary restriction of public employment entirely clear

---

Cal.2d 61 [4 Cal.Rptr. 489, 351 P.2d 761] (exclusion)). Thus the principles underlying all of the decisions are applicable here. Moreover, even if a distinction were to be drawn between exclusions and discharges, surely a discharge, involving the added factor of a "vested" interest in employment, would be entitled to at least as much protection as an exclusion from employment. Thus the cases to be discussed below cannot validly be distinguished from the instant matter solely because several of them arose in the context of an exclusion from employment.

[6]The state relied heavily on the court's declaration in *Adler* v. *Board of Education* (1952) 342 U.S. 485, 492 [96 L.Ed. 517, 524, 72 S.Ct. 380, 27 A.L.R.2d 472], that "It is clear that . . . persons have the right under our law to assemble, speak, think and believe as they will. [Citation.] It is equally clear that they have no right to work for the State in the School System on their own terms." Even in *Adler,* however, the court qualified this latter statement by explaining: "They may work for the school system upon the *reasonable* terms laid down by the proper authorities in New York." (Italics added.) (*Id.*)

by explicitly responding to the "logic" of the "right-privilege" dogma. The court stated, "We need not pause to consider whether an abstract right to public employment exists. It is sufficient to say that constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently *arbitrary* or discriminatory." (Italics added.) (344 U.S. at pp. 191-192 [97 L.Ed. at p. 222].)

The due process limitation on the arbitrary exclusion or dismissal of public employees, which first fully emerged in *Wieman,* was enunciated in equally explicit terms in *Slochower* v. *Board of Education* (1956) 350 U.S. 551 [100 L.Ed. 692, 76 S.Ct. 637]. In *Slochower,* a teacher who had refused on Fifth Amendment grounds to answer several questions posed by a federal Congressional committee, was dismissed from his position at a state college on the basis of a New York statute which provided for the automatic dismissal of any employee who utilized the privilege against self-incrimination to avoid answering governmental inquiries. The teacher challenged the constitutionality of his dismissal on two distinct grounds: (1) that the law abridged his "privileges and immunities" as a United States citizen, since it imposed a penalty on the exercise of his Fifth Amendment rights, and (2) that the law "violates due process . . . because the mere claim of privilege under the Fifth Amendment does not provide a reasonable basis for the State to terminate his employment." (350 U.S. at p. 555 [100 L.Ed. at pp. 698-699].) The Supreme Court explicitly did not reach the first question—concerning the statute's alleged impairment of the privilege against self-incrimination—but instead rested its holding directly on its conclusion that "summary dismissal of appellant in the circumstances of the case violates due process of law." (*Id.*) Thus *Slochower* is beyond peradventure strictly a "due process" decision.

The *Slochower* court began its analysis by recognizing the very limited aid afforded by the "right-privilege" formulation; the court declared, "To state that a person does not have a constitutional right to government employment is only to say that he must comply with *reasonable,* lawful and non-discriminatory terms laid down by the proper authorities." (*Id.*) (Italics added.) The court then reviewed the series of "public employee" cases discussed in *Wieman* and found that all of these decisions had "emphasized that [in excluding or dismissing an employee] the State must conform to the requirements of due process." (350 U.S. at p. 556 [100 L.Ed. at p. 699].) Conformity to due process, under long-established constitutional precedent, required that the government's exclusion or dismissal of a particular employee not be arbitrary, i.e., that the reason or basis for the government decision must have some rational connection to the employee's "fitness and suitability for the public service." (*Garner* v. *Los An-*

*geles Board* (1952) 341 U.S. 716, 720 [95 L.Ed. 1317, 1322, 71 S.Ct. 909].)

Using this traditional "non-arbitrary," or "rationality" standard of due process as its guide, the *Slochower* court concluded that the dismissal of the teacher in the case at bar, solely on the basis of "events occurring before a federal committee whose inquiry was announced as not directed at 'the property, affairs, or government of the city, or . . . official conduct of city employees,' " bore no reasonable relationship to the teacher's fitness for employment and thus was violative of due process. The court reasoned, "Since no inference of guilt was possible from the claim [of privilege] before the federal committee, the discharge falls of its own weight *as wholly without support. There has not been the 'protection of the individual against arbitrary action' which Mr. Justice Cardozo characterized as the very essence of due process. Ohio Bell Telephone Co.* v. *Commission* (1937) 301 U.S. 292, 302." (Italics added.) (350 U.S. at p. 559 [100 L.Ed. at pp. 700-701].)

Indeed, even the dissenters in *Slochower* did not take issue with the general constitutional principle that due process prohibits the government from discharging an employee on arbitrary grounds, the principle which the majority in the instant case decline to accept. Justice Harlan, writing in dissent, posed the relevant question most succinctly: "Does such a statute bear a *reasonable relation* to New York's interest in insuring the qualifications of its teachers?" He, and the other dissenters, found the statute nonviolative of due process only after concluding that a teacher's refusal to answer official inquiries could reasonably be said to bear upon his fitness for public employment.

This general constitutional precept—that the due process clause precludes the arbitrary dismissal or exclusion of public employees—recognized by *Wieman* and *Slochower* over a decade ago, has been explicitly articulated and applied by our own state courts as well. *Wilson* v. *City of Los Angeles* (1960) 54 Cal.2d 61 [4 Cal.Rptr. 489, 351 P.2d 761] provides perhaps the clearest example of the principle at work. In *Wilson*, a county clerk had been dismissed from Los Angeles County's employ in 1948 when she refused to sign the then prevailing loyalty oath. Eleven years later, in 1959, Wilson sought public employment with the City of Los Angeles, passed all examinations necessary to qualify her for the position of "senior clerk," and informed the city that she was willing to sign the current state loyalty oath, which had been revised since 1948. The city board of civil service examiners refused to certify her application for employment, however, relying on a local rule that anyone who had previously been discharged from public service was ineligible for further employment, regardless of the reason for

the initial discharge. Wilson sought a writ of mandate to compel the board to certify her for public employment, contending that the board's refusal was arbitrary and unconstitutional.

The *Wilson* court, relying on *Wieman,* recognized at the outset of its opinion the constitutional principle which the majority in the present case apparently would deny. Declaring unambiguously that "The right which the petitioner seeks to preserve here—that is, the right to public employment providing that such employment is available and that she meets all reasonable requirements—*is entitled to protection at least against deprivation thereof by arbitrary means"* (italics added) (54 Cal.2d at p. 63), the court viewed the determinative question before it as "whether the commission acted in an arbitrary or discriminatory manner in disqualifying the petitioner." (54 Cal.2d at p. 64.) This is precisely the same question which the majority assert cannot be raised in the instant case. Thus, in simply framing the issue before it, the *Wilson* decision demonstrates the error of the majority approach.

The *Wilson* case provides additional guidance, of course, by its final resolution of the "arbitrariness" issue. In determining that the city board's exclusion of Wilson from public service was "arbitrary" (54 Cal.2d at p. 66), this court emphasized that the applicant's past refusal to sign a loyalty oath bore no relation to her present fitness for reemployment: "[D]isqualification at an earlier date for failure to swear to an oath then required, has no more bearing on her present qualification than would her failure to meet prior educational requirements since abandoned." (54 Cal.2d at p. 65.) The concluding paragraph leaves no doubt that, in overturning the board's decision, the court relied squarely on the constitutional proscription of arbitrary exclusion from public employment. We stated: "It is manifest that the relevancy of the petitioner's refusal to subscribe, for reasons of conscience, to a different oath eleven years earlier, and her discharge from public office at that time, is too remote to deprive her of consideration at this time . . . . [T]o disqualify the petitioner upon the ground relied on by the commission must be regarded as *arbitrary and therefore unwarranted."* (Italics added.) (54 Cal.2d at p. 66.)[7]

The general teaching of *Wieman, Slochower* and *Wilson,* as well as the

---

[7]The *Wilson* decision is particularly significant for the instant case, since the dismissal in *Wilson,* as the dismissal here, was not mandated by an explicit statute but was grounded in the discretion of the supervisory authority. The court acted in *Wilson* not to invalidate an entire statutory provision, but simply to declare a single employee's exclusion unconstitutional as arbitrary. *Wilson* therefore provides direct precedent for the relief petitioner seeks in the case at bar.

numerous cases following these decisions,[8] is that the due process prohibition of arbitrary governmental action is applicable to the government's dismissal or exclusion of a public employee. Although the majority would apparently dismiss these cases as simply involving discharges based on an employee's exercise of a specific constitutional right, such as the Fifth Amendment privilege against self-incrimination, a close reading of the decisions refutes such a limited interpretation. In neither *Wieman* nor *Wilson* did the court intimate that the dismissal was improper because it impaired a specific constitutional right; instead the courts invalidated the state action as "arbitrary," as having no rational relation to the employee's fitness for work.[9] And in *Slochower,* it is perhaps even clearer that the decision rested solely on "due process" grounds and not on the impairment of another constitutional right, since, as noted above, both issues were raised before the Supreme Court and the court expressly found it unnecessary to determine if the state action improperly impaired the teacher's Fifth Amendment rights.[10]

---

[8]See, e.g., *Connell* v. *Higginbotham* (1971) 403 U.S. 207 [29 L.Ed.2d 418, 91 S.Ct. 1772]; *Cramp* v. *Board of Public Institutions* (1961) 368 U.S. 278, 288 [7 L.Ed.2d 285, 292, 82 S.Ct. 275]; *Beilan* v. *Board of Education* (1958) 357 U.S. 399, 405 [2 L.Ed.2d 1414, 1419, 78 S.Ct. 1317]; *Board of Education* v. *Mass* (1956) 47 Cal.2d 494 [304 P.2d 1015]; *Hofberg* v. *County of Los Angeles Civil Service Commission* (1968) 258 Cal.App.2d 433, 437 [65 Cal.Rptr. 759].

[9]In *Wieman* the court made no reference to a teacher's constitutional freedom of association, and the opinion proceeds as if the existence of such a constitutional right were completely irrelevant to the court's decision.

In *Wilson,* the court not only did not *rely* on the existence of a constitutional right, but it obviously determined the issue before it on the assumption that no such right was involved. As *Wilson* noted, the employee's earlier dismissal had been expressly affirmed against a constitutional attack by a prior judicial decision (*Hirschman* v. *County of Los Angeles* (1952) 39 Cal.2d 698 [249 P.2d 287]) and the *Wilson* court offered absolutely no suggestion that the earlier conclusion had been mistaken. Under these circumstances, there can be no question but that *Wilson* is strictly a "due process" decision.

[10]In *Hollon* v. *Pierce* (1967) 257 Cal.App.2d 468 [64 Cal.Rptr. 808], the court similarly recognized a "due process" limit on arbitrary discharge, independent of the existence of a more "specific" constitutional right. In *Hollon* a school bus driver was discharged after it was discovered that his name appeared on a religious tract, several passages of which alluded to the burning of school houses and the murdering of school children. Although Hollon had not written the tract, he admitted to believing the philosophy advanced in the work, and the school board, after a hearing, concurred in the dismissal.

Hollon brought suit for reinstatement, attacking his dismissal as (1) based upon a "constitutionally forbidden inquiry into the truth or falsity of his religious beliefs," (257 Cal.App.2d at pp. 476-477) and (2) arbitrary. After initially rejecting the contention that First Amendment rights were at stake in the dismissal, the court continued to review the evidence to insure that the school board's decision had not been arbitrary. The court stated, "The focal point of review here is arbitrariness, not religious discrimination." (257 Cal.App.2d at p. 478.) The court ultimately upheld the employee's dismissal, finding that there was ample evidence that Hollon "cannot be trusted with the safety of his passengers." (257 Cal.App.2d at p. 478.)

Thus, although the majority recognize the general constitutional development heralding the demise of the "right-privilege" doctrine, the majority fail to recognize that this demise has been accompanied by the emergence of *two* separate strains of constitutional decisions, rather than the single line of cases the majority identify. The first group of cases—exemplified by the decisions just reviewed—involve dismissals or exclusions which have been overturned because the reason for the government action bore no rational relation to "job-fitness" at all. In these instances, the government's action was found to be a denial of due process because it was "arbitrary"; *Slochower* clearly reveals that in such a case the existence of an independent constitutional right is not essential to the constitutional determination. As Justice Harlan's dissent in *Slochower* recognizes, the determinative constitutional question in these cases is simply whether the grounds for the state's action "bear a reasonable relation to [the state's] interest in insuring the qualification of its [employees.]" (*Slochower* v. *Board of Education* (1956) 350 U.S. 551, 566 [100 L.Ed. 692, 704, 76 S.Ct. 637] (Harlan, J. dissenting).) Under these decisions, the due process clause prohibits the arbitrary dismissal or exclusion of public employees by the government.

The second category of cases, the line of decisions recognized by the majority, encompasses situations in which the grounds for exclusion or dismissal, while rationally related to a legitimate government concern for public employment and hence not "arbitrary," entail the impairment of a specific constitutional right. In *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331 [38 Cal.Rptr. 625, 392 P.2d 385], for example, we addressed the constitutionality of a statute which authorized the dismissal of public employees for engaging in a broad range of political activities. As we recognized in *Fort*, the regulation of political activity of public employees frequently does bear at least a rational relation to the government's interest in a harmonious and non-corrupt public service (61 Cal.2d at p. 338; cf. *United Public Workers* v. *Mitchell* (1947) 330 U.S. 75, 101 [91 L.Ed. 754, 773, 67 S.Ct. 556]). Nevertheless, in light of the constitutional protection generally afforded by the First Amendment in safeguarding the citizen's participation in political activities, we required the government to show more than that the grounds for dismissal bore a "rational relation" to a legitimate state purpose in order to justify such a limitation on specific constitutional rights. (61 Cal. 2d at p. 337; see, e.g., *City of Carmel-By-the-Sea* v. *Young* (1970) 2 Cal.3d 259, 263-265 [85 Cal.Rptr. 1, 466 P.2d 225]; *Vogel* v. *County of Los Angeles* (1967) 68 Cal.2d 18, 21 [64 Cal.Rptr. 409, 434 P.2d 961].)[11]

---

[11]*Shelton* v. *Tucker* (1960) 364 U.S. 479 [5 L.Ed.2d 231, 81 S.Ct. 247] and *Pickering* v. *Board of Education* (1968) 391 U.S. 563 [20 L.Ed.2d 811, 88 S.Ct. 1731] also illustrate the proposition that in cases in which a dismissal involves the impairment of a specific constitutional right, mere "rationality" will not be sufficient

*Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499 [55 Cal.Rptr. 401, 421 P.2d 409], in encapsulating *Fort's* analysis in a tripartite "test," illuminates the disparate constitutional standards that have been applied to these two distinct categories of cases. In *Bagley* we held "that a governmental agency which would require a waiver of constitutional rights as a condition of public employment must demonstrate : (1) that the political restraints rationally relate to the enhancement of the public service, (2) that the benefits which the public gains by the restraints outweigh the resulting impairment of constitutional rights, and (3) that no alternatives less subversive of constitutional rights are available." (65 Cal.2d at pp. 501-502.)

*Bagley's* constitutional standard is quite obviously more stringent than the "due process" standard which both the majority and dissenters applied in *Slochower* or which governed in *Wieman* and *Wilson;* indeed, the "rational relationship" standard which constitutes the sole "due process" criterion, is only the first criterion which a dismissal or exclusion based on an employee's exercise of a specific constitutional right must satisfy.[12]

---

justification. In *Shelton* a public school teacher was dismissed for refusing to comply with a state statute requiring public employees to list all the organizations they had belonged to in the past five years. Although the court recognized that disclosure was at least rationally related to two legitimate government objectives (avoiding conflicts of interest and detecting time-consuming commitments), the court also determined that the requirement would inevitably discourage controversial political associations by teachers. In view of the provision's potential chilling effect on the First Amendment freedom of association and speech, and the less restrictive means open to the state to achieve its objective, the court invalidated this "rational" disclosure requirement.

In *Pickering* a school teacher was discharged for sending a letter to the local paper criticizing the Board of Education's handling of past revenue bond elections. The court acknowledged that the government has a legitimate interest in regulating its employees' public criticism of their superiors under some circumstances; in analyzing the propriety of the dismissal, however, the court did not confine its examination to whether there was a "rational" basis for the action. Instead, the court viewed the resolution of the issue as involving "*a balance* between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of [its] public service" (391 U.S. at p. 568 [20 L.Ed.2d at p. 817]). Although the court found that several of the teacher's public statements were false, it nevertheless concluded that, on balance, the dismissal could not be constitutionally justified.

[12]The dual constitutional standards which we have identified in the "public employment" cases finds a marked parallel in the two-level test currently employed in reviewing legislative classifications under the equal protection clause. In the equal protection area the less stringent constitutional standard, applicable in most situations, requires only that distinctions drawn by a challenged statute "bear some rational relationship to a conceivable legitimate state purpose" (*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784 [87 Cal.Rptr. 839, 471 P.2d 487]); this is precisely the same standard of "nonarbitrariness" imposed by the above "due process" decisions, the standard I believe to be applicable in the instant case.

Under the "strict" equal protection standard. on the other hand, "the state bears the burden of establishing not only that it has a *compelling* interest which justifies

In sum, the majority's focus on the latter class of decisions has obscured its vision of the earlier, more fundamental constitutional precedents proscribing "arbitrary" dismissals. Although this confusion may in part stem from some contrary dicta in a Supreme Court decision subsequent to *Wieman* and *Slochower*,[13] the court as recently as June 1971 cited *Slochower* as controlling precedent in a public employment case[14] and thus, I believe, the

the law but that the distinctions drawn by the law are *necessary* to further its purpose." (*In re Antazo* (1970) 3 Cal.3d 100, 110-111 [89 Cal.Rptr. 255, 473 P.2d 999]; see, e.g., *Sail'er Inn, Inc.* v. *Kirby* (1971) *ante,* pp. 1, 16 [95 Cal.Rptr. 329, 485 P.2d 529] and cases cited therein.) This strict standard is quite analogous to the analysis established in *Fort* and *Bagley* to test governmental dismissals which impair specific constitutional rights. Indeed, the *Fort* court spoke in almost the identical language of the current equal protection test, requiring the state to "show that it has a 'compelling' interest in limiting [constitutional] rights" (61 Cal.2d at p. 337), and additionally that the restriction is "drawn with narrow specificity." (*Id.*)

The congruence of constitutional standards in these two areas is not simply a coincidence, of course, but has resulted from a consistent appraisal of the exercise of government authority vis-a-vis individual interests. In general, when government activity does not impair a specific constitutionally protected interest, the courts have recognized that the Constitution grants to the Legislature and executive considerable leeway to act, so long as the action is rationally related to any legitimate state interest. When government activity threatens to impair specific constitutional rights, however, the state bears a much greater burden of justification. Both the equal protection and due process decisions recognize, however, that the Constitution demands that government action, whether legislative or executive in origin, not be arbitrary.

[13]In *Cafeteria Workers* v. *McElroy* (1961) 367 U.S. 886 [6 L.Ed.2d 1230, 81 S.Ct. 1743], a 5-4 decision, the majority relied on several of the early "privilege" cases and declared that: "It has become a settled principle that government employment, in the absence of legislation, can be revoked at the will of the appointing officer." (367 U.S. at p. 896 [6 L.Ed.2d at p. 1237].) The *Cafeteria Workers* decision itself, however, involved the authority of a commanding officer to determine which civilians were permitted to enter his military establishment; the court specifically stated, "In that proprietary military capacity, the Federal Government . . . has traditionally exercised unfettered control." (*Id.*) The case did not involve the discharge of a public employee, and thus the court's reference to public employment is clearly dicta.

Moreover, in a subsequent section of the opinion, the *Cafeteria Workers* majority drew back from its previous broad dicta, and conceded that the court's decision in *Wieman* v. *Updegraff* did "demonstrate . . . that the state and federal governments, even in the exercise of their internal operations, do not constitutionally have the complete freedom of action enjoyed by a private employer." (367 U.S. at pp. 897-898 [6 L.Ed.2d at p. 1238].) Thereafter, the court assumed that a public employee's dismissal would be invalid "if the announced grounds for [his] exclusion had been patently arbitrary or discriminatory," (*id.*) and the dissenters viewed this assumption as a recognition by the majority of a substantive constitutional right "not to be arbitrarily injured by Government." (367 U.S. at p. 900 [6 L.Ed.2d at p. 1239] (Brennan, J., dissenting).)

Finally, the recent activity of the Supreme Court in the procedural due process area, to be discussed below, raises serious doubts as to the continued validity of the closely divided *Cafeteria Workers* decision. (See also *Roth* v. *Board of Regents* (W.D. Wis. 1970) 310 F.Supp. 972, 976-979.)

[14]In *Connell* v. *Higginbotham* (1971) 403 U.S. 207 [29 L.Ed.2d 418, 91 S.Ct. 1772], the court invalidated a portion of Florida's "loyalty oath" statute as "fall[ing] within the ambit of decisions of the court proscribing summary dismissal from public

Supreme Court's decisions clearly hold that the "due process" clause's proscription on arbitrary action fully applies to dismissals from public employment.

Indeed, over the past decade California courts have explicitly recognized the dual nature of constitutional limitations in this area. In *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331, 334 [38 Cal.Rptr. 625, 392 P. 2d 385], we declared that "[I]t is settled that a person cannot properly be barred or removed from public employment *arbitrarily or in disregard of his constitutional rights*" and that statement of the governing constitutional rule has been continually reiterated in a host of subsequent decisions. (*Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 507 [55 Cal. Rptr. 401, 421 P.2d 409]; *Hofberg* v. *County of Los Angeles Civil Service Commission* (1968) 258 Cal.App.2d 433, 437 [65 Cal.Rptr. 759]; *Hollon* v. *Pierce* (1967) 257 Cal.App.2d 468, 478 [64 Cal.Rptr. 808]; *Belshaw* v. *City of Berkeley* (1966) 246 Cal.App.2d 493, 496 [54 Cal.Rptr. 727]; cf. *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 579 [79 Cal.Rptr. 77, 456 P.2d 645].) In condoning the existence of a "wholly subjective power of removal" in the government in the instant case, the majority would apparently dismiss our repeated proscription of "arbitrary" discharges in the above cases as inconsequential surplusage; the *Wieman, Slochower* and *Wilson* decisions, however, stand in direct opposition to the majority's narrow rendition of the governing constitutional principle.

In allowing public employees a domain of purely arbitrary authority, the majority also undermine much of the practical protection that they purport to afford to employees' exercise of *specific* constitutional rights. The expanse of an "absolute" and "unfettered" discretion to dismiss can easily be utilized to cloak a discharge based on clearly unconstitutional grounds (see *Cafeteria Workers* v. *McElroy* (1961) 367 U.S. 886, 901 [6 L.Ed.2d 1230, 1239, 81 S.Ct. 1743] (Brennan, J. dissenting); Note, *Arbitrary Teacher Dismissals* (1969) 44 N.Y.U.L.Rev. 836, 841-842) and, as the instant case reveals, an employee faces a most difficult task if he must establish the forces that "actually" motivated a supervisor who is permitted to dismiss him for any or no reason at all. In such a case it appears particularly essential that the supervisor be required to come forth with at least some rational basis to support the dismissal, and not be allowed to simply hide behind a "wholly subjective" decision-making authority. (See *Roth* v. *Board of Regents* (W.D.Wis. 1970) 310 F. Supp. 972, 981-982.)

Moreover, in view of the judiciary's historical recognition of the im-

employment without hearing or inquiry required by due process. *Slochower* v. *Board of Education,* 350 U.S. 551 (1956)." (See also *Bell* v. *Burson* (1971) 402 U.S. 535 [29 L.Ed.2d 90, 91 S.Ct. 1586, 1589].)

portance of protecting individuals' employment opportunities, it seems particularly perplexing that the majority should seek to preserve an enclave for "totally subjective," indeed arbitrary, government action, in a case involving the loss of permanent employment. Governmental regulation of private employment opportunities has traditionally been circumscribed by the full panoply of constitutional protections, including the due process prohibition of arbitrary state action. Thus, it has long been established that in issuing or revoking professional credentials or occupational licenses the government has no "wholly subjective" authority and therefore cannot act arbitrarily. (See, e.g., *Ohio Bell Telephone Co.* v. *Public Utilities Com.* (1937) 301 U.S. 292 [81 L.Ed. 1093, 57 S.Ct. 724]; *Willner* v. *Committee on Character* (1963) 373 U.S. 96 [10 L.Ed.2d 224, 83 S.Ct. 1175]; *Schware* v. *Board of Bar Examiners* (1957) 353 U.S. 232 [1 L.Ed.2d 796, 77 S.Ct. 752]; *Drummey* v. *State Bd. of Funeral Directors* (1939) 13 Cal.2d 75 [87 P.2d 848]; *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67 [64 Cal.Rptr. 785, 435 P.2d 553]; *Endler* v. *Schutzbank* (1968) 68 Cal.2d 162 [65 Cal.Rptr. 297, 436 P.2d 297].)

Although a state's action in dismissing its own employees has frequently been distinguished from its licensing activity on the grounds that the former is only an exercise of a "proprietary" act, while the latter involves the use of state authority in a "governmental" or "regulatory" capacity (see, e.g., *Cafeteria Workers* v. *McElroy* (1961) 367 U.S. 886, 896 [6 L.Ed.2d 1230, 1236, 81 S.Ct. 1743]), Professor Van Alstyne has recently emphasized: ". . . the [Fourteenth] Amendment does not say that 'no State, except when acting in a proprietary capacity,' shall deny due process; rather, it makes no distinction at all respecting the capacity in which the state acts." (Van Alstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law* (1968) 81 Harv.L.Rev. 1439, 1461.)

Recent decisions, imposing constitutional restraints upon the government's conduct of such "proprietary" activities as the removal of a tenant from public housing (see *Escalera* v. *New York City Housing Authority* (2d Cir. 1970) 425 F.2d 853, 861, cert. den. 400 U.S. 853 [27 L.Ed.2d 91, 91 S.Ct. 54]; *Ruffin* v. *Housing Authority of New Orleans* (E.D.La. 1969) 301 F.Supp. 251; *Fuller* v. *Urstadt* (1971) 28 N.Y.2d 315 [321 N.Y.S.2d 601, 270 N.E.2d 321]; cf. *Thorpe* v. *Housing Authority* (1967) 386 U.S. 670 [18 L.Ed.2d 394, 87 S.Ct. 1244]), the expulsion of a student from a public university (*Dixon* v. *Alabama State Board of Education* (5th Cir. 1961) 294 F.2d 150, cert. den. (1961) 368 U.S. 930 [7 L.Ed.2d 193, 82 S.Ct. 368]; *Goldberg* v. *Regents of the University of California* (1967) 248 Cal.App.2d 867, 877 [57 Cal.Rptr. 463]), or the termination of a grant of welfare (*Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d

287, 90 S.Ct. 1011]) have exposed the "proprietary-governmental" dichotomy as no more valid than the "right-privilege" distinction it replaced. As Justice Douglas declared in his concurrence in *Thorpe* v. *Housing Authority* (1967) 386 U.S. 670, 678 [18 L.Ed.2d 394, 400, 87 S.Ct. 1244]: "It is not depositive to maintain that a private landlord might terminate a lease at his pleasure. For this is the government we are dealing with, and the actions of the government are circumscribed by the Bill of Rights and the Fourteenth Amendment. The government as landlord is still government. It must not act arbitrarily, for, unlike private landlords, it is subject to the requirements of due process. Arbitrary action is not due process."[15]

Furthermore, the majority's decision, preserving a governmental prerogative of arbitrary discharge, is even more anomalous when viewed in light of this court's numerous decisions carefully restricting the arbitrary exercise of authority by *private* bodies, such as labor unions and professional associations, in situations in which the private action has a significant impact on an individual's livelihood. In *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721, 731 [155 P.2d 329, 160 A.L.R. 900] and *Dotson* v. *Intl. Alliance etc. Employes* (1949) 34 Cal.2d 362 [210 P.2d 5], for example, we held that a labor organization which maintained a closed shop, and thus had effective control of the availability of specific employment for an individual, could not *"arbitrarily"* exclude applicants for membership. "Where a union has . . . attained a monopoly of the supply of labor by means of closed shop agreements . . . such a union occupies a *quasi-*

---

[15]The practice of applying "due process" principles in the "licensing cases," but not in "public employment" matters has also been defended by reference to the relative harm produced by the respective governmental actions. Thus, state action in revoking a license or credential is sometimes seen as closing an entire "field of employment," while a discharge from public employment is viewed as simply the loss of a single job. Initially, however, this approach is oversimplistic, because in practice many positions of public employment do not have counterparts in the private job market; in the instant case, for example, it seems unlikely that there will be much call for petitioner's work as a housing inspector from private enterprise. Second, even if a public employee's occupation does theoretically exist in the private sector, a discharge from public employment, in light of the current employment situation, will almost inevitably result in serious and prolonged unemployment. In the present circumstances, the differential hardship between the loss of a job and the closing of a field of employment is largely hypothetical.

Third, and most important, as discussed *infra,* recent Supreme Court decisions have not confined the operation of the due process clause to individual "injuries" as severe as the curtailment of an entire profession or occupation. Instead, the cases have indicated that due process comes into play at a much lower threshold of injury, whenever "important" (*Bell* v. *Burson* (1971) 402 U.S. 535 [29 L.Ed.2d 90, 91 S.Ct. 1586, 1589]) or "substantial" (*Randone* v. *Appellate Department* (1971) *ante,* p. 536, at p. 552 [96 Cal.Rptr. 709, 488 P.2d 13]) interests of an individual are affected; as explained below, under the recent decisions the loss of a permanent job clearly constitutes a sufficiently important interest to warrant due process protection.

*public position* similar to that of a public service business and it has certain corresponding obligations. It may no longer claim the same freedom from legal restraint enjoyed by golf clubs or fraternal associations. Its asserted right to choose its own members does not merely relate to social relations; it affects the fundamental right to work for a living." (*James* v. *Marinship Corp.* (1944) 25 Cal.2d 721, 731 [155 P.2d 329, 160 A.L.R. 900], italics added.) The *James* court concluded "an *arbitrarily* closed or partially closed union is incompatible with a closed shop" (italics added) (*id.*; see also *Thorman* v. *Intl. Alliance etc. Employees* (1958) 49 Cal.2d 629, 634 [320 P.2d 494]; *Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134 [231 P.2d 6]). And in *Directors Guild of America, Inc.* v. *Superior Court* (1966) 64 Cal.2d 42, 53-54 [48 Cal.Rptr. 710, 409 P.2d 934], we expanded this ruling and held that "the . . . grounds for condemnation of *arbitrary* rejection from membership apply as forcefully to the situation in which the union does not have a union shop contract as to that in which it does." (Italics added.)

Similarly, we have recently applied the principles of these union cases to rejections or expulsions by trade and professional associations, and have determined that whenever membership in such associations would have a significant economic and professional bearing on an applicant's livelihood, "an applicant for membership has a judicially enforceable right to have his application considered in a manner comporting with the fundamentals of due process, *including the showing of cause for rejection.*" (Italics added.) (*Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 166 [81 Cal.Rptr. 623, 460 P.2d 495]; see *Kronen* v. *Pacific Coast Society of Orthodontists* (1965) 237 Cal.App.2d 289 [46 Cal.Rptr. 808].)

As our reasoning in *James* clearly illustrates, unions and other business and professional associations are held to a strict standard of "non-arbitrariness" on the basis of the "quasi-public" positions they have been found to occupy. It is indeed ironic that the majority in the instant case, now apply a less demanding standard, indeed *no* standard at all, to the *public's* own treatment of its employees.

Finally, the majority fail to recognize that a constitutional limitation on "arbitrary" or "capricious" dismissals need not, and properly should not, withdraw from public officials the considerable discretion required to determine an individual employee's fitness for his job. The majority quite reasonably balk at the establishment of a constitutional principle which they believe would require courts to judge in the first instance the reasonableness or arbitrariness of every governmental discharge; our courts have neither the resources nor the expertise for such an undertaking. The task of generating appropriate qualifications and standards for continued em-

ployment quite properly belongs to the individual governmental entities in charge of the particular employment and it is entirely consonant with constitutional principles that such bodies be delegated a broad discretion within which to exercise their expertise.[16] A similarly broad discretion has, of course, been granted to many administrative agencies charged with regulating business and professional licensing.

Although I agree that we must recognize a "broad discretion" residing in employing agencies or supervisory personnel, it does not follow that we must similarly acknowledge this discretion to be "absolute" or "unfettered" or that it may be abused at will without any opportunity for review. (Cf. Jaffe, Judicial Control of Administrative Action (1965) pp. 182, 586-587.) To be sure, the judicial role in this field must appropriately be a limited one, confined to insuring that the agencies themselves establish rational

---

[16]We recognize, of course, that in evaluating a continuing employment relationship a wide range of factors may properly be considered, and that some of the reluctance to require standards for dismissals stems from a fear that such standards will preclude the use of legitimate, but more subjective, criteria, such as the "compatibility" of employee and employer. Government employment, as private employment, encompasses an enormous range of working relationships, however, and the reasonableness of specific criteria for dismissal cannot be judged in the abstract, but unavoidably turns on all the circumstances of a particular employment position. (See generally Note, *Dismissal of Federal Employees—the Emerging Judicial Role* (1966) 66 Colum.L.Rev. 719.)

In many areas it is undoubtedly true that the working relationship between superior and employee is necessarily a close, or even intimate one, and, under such circumstances, simple incompatibility of personalities or ideologies may well be a perfectly reasonable, and therefore non-arbitrary, ground for dismissal. The relationship of an officer of a corporation or agency and his confidential secretary or clerk is perhaps the paradigm example of such a relationship.

Every government position does not involve the same kind of close working relationship, however, and thus in other situations a clash of personalities or viewpoints between an employee and a government employer may not afford a reasonable ground for discharge. In reversing the discharge of a public school teacher for public statements critical of his employer-board of education, in *Pickering* v. *Board of Education* (1968) 391 U.S. 563, 569-570 [20 L.Ed.2d 811, 818, 88 S.Ct. 1731], for example, the United States Supreme Court noted that "[t]he statements are in no way directed towards any person with whom applicant would normally be in contact in the course of his daily work as a teacher" and then concluded: "Appellant's employment relationships with the Board . . . are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." (See also *id.* at p. 570, fn. 3 [20 L.Ed.2d at p. 818].)

The establishment of rational standards for employment in light of the characteristics of a particular job is, of course, properly within the province of the employing entity which is most familiar with the duties involved. This task of creating standards sensitive to the demands of individual positions has become a familiar necessity in a working environment founded largely upon collective bargaining agreements and civil service provisions which preclude the arbitrary discharge of employees; due process demands that reasonable criteria govern all public employment decisions as well. (See Davis, Discretionary Justice (1971) p. 58.)

standards for continued employment and that they apply such guidelines in a non-arbitrary fashion. (See *Roth* v. *Board of Regents* (W.D.Wis. 1970) 310 F.Supp. 972, 979.) Nevertheless, when the government does discharge an employee "arbitrarily," thereby abusing this broad discretion, I believe the courts must be open to afford relief. "Where discretion is conferred upon an administrative officer to render a decision, this decision must be honestly rendered, and if it is arbitrary or capricious or rendered in bad faith, then courts have the power to review the decision and set it aside." (*Crocker* v. *United States* (1955) 127 F. Supp. 568, 573 [130 Ct.Cl. 567].)

On the present record, the dismissal of Bogacki can only be viewed as arbitrary. Two tribunals have found him fully competent for his job, and the county board of review, the local agency charged with the responsibility of reviewing discharges, concluded that there was no reasonable ground for his discharge. While I believe that a public employer may exercise a broad discretion in establishing standards for continued employment, I cannot understand why the preservation of that "discretion" necessitates or justifies the discharge of an employee without any factual basis whatever. As discussed above, I conclude that the government's discharge of an employee on what presently appears to be "no grounds" is incompatible with due process strictures; for this reason alone, petitioner is entitled to reinstatement.

2. *As interpreted by the majority, the county's discharge procedure embodies a denial of procedural due process, by authorizing the discharge of a permanent employee without a meaningful hearing.*

The second principal question raised by the majority opinion is whether a permanent public employee suffers a denial of procedural due process when he is discharged without a meaningful hearing. In this case, of course, petitioner was afforded a hearing, pursuant to a local resolution, at which both he and his supervisor presented evidence relating to the discharge. Under the majority opinion, however, this review procedure, while evidentially fair in all respects, cannot be termed a "meaningful" hearing on petitioner's *discharge,* because the majority conclude that the county resolution gives the review board no authority to remedy an improper discharge by reinstating the employee in his former position. As interpreted by the majority, this review procedure thus is not a hearing on the "discharge" at all, but is simply a hearing on an individual's eligibility for future public employment.

Although the terms of the resolution are concededly ambiguous, in view of the procedural due process requirements which I conclude are applicable to the government's discharge of permanent employees, I believe the provi-

sion must be interpreted to permit the review board to order the reinstatement of an improperly dismissed employee. The majority's contrary interpretation implicitly denies that a permanent public employee is entitled to any meaningful hearing when the government terminates his employment. Although earlier United States Supreme Court decisions indicate support for such a position,[17] I do not believe such a conclusion can be reconciled with recent constitutional decisions in the procedural due process field.

The past two years have witnessed an unusually heavy flurry of cases, in both the United States Supreme Court and in this court, presenting the issue of the applicability of procedural due process to a broad range of governmental action. In *Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337 [23 L.Ed.2d 349, 89 S.Ct. 1820], the seminal decision of the recent procedural due process development, the Supreme Court determined that a Wisconsin prejudgment wage garnishment provision was unconstitutional because it authorized the withholding of a debtor's wages without affording the debtor the due process protections of notice and a meaningful hearing. In subsequent decisions the court has found these minimal due process requirements of notice and hearing applicable to such governmental actions as the termination of welfare benefits (*Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011]), the "public posting" of any individual as an "excessive drinker" (*Wisconsin* v. *Constantineau* (1971) 400 U.S. 433 [27 L.Ed.2d 515, 91 S.Ct. 507]) and the suspension of an automobile driver's license. (*Bell* v. *Burson* (1971) 402 U.S. 535 [29 L.Ed.2d 90, 91 S.Ct. 1586].)

Our own court, following the constitutional teachings of *Sniadach,* has recently recognized the necessity of affording notice and hearing when the state authorizes the prejudgment repossession of personal goods, such as "television sets, refrigerators, [or] stoves" (*Blair* v. *Pitchess* (1971) *ante,* p. 258 [96 Cal.Rptr. 42, 486 P.2d 1242]) or the prejudgment attachment of all kinds of property. (*Randone* v. *Appellate Department* (1971) *ante,* p. 536 [96 Cal.Rptr. 709, 488 P.2d 13].) In light of the importance of an individual's interest in continued employment, especially when compared to the interests involved in these proceeding cases, it seems incredible that the majority can now maintain that the minimal requirement of a meaningful hearing is not applicable when the government permanently terminates that employment. (See *Ricucci* v. *United States* (1970) 425 F.2d 1252, 1256-1257 [192 Ct.Cl. 1] (Skelton, J. concurring); cf. *Roth* v. *Board of Regents of State Colleges* (W.D.Wis. 1970) 310 F.Supp. 972, 981.)

---

[17]See, e.g., *Cafeteria Workers* v. *McElroy* (1961) 367 U.S. 886, 896 [6 L.Ed.2d 1230, 1236, 81 S.Ct. 1743], discussed at footnote 13, *supra.*

The comparison of the instant case with the court's analysis in *Sniadach* is most revealing. In *Sniadach* the court emphasized the great hardships that would frequently befall a wage earner and his family as a result of the withholding of a significant portion of his earnings, and then concluded, "Where the taking of property is so obvious, it needs no extended argument to conclude that absent notice and a prior hearing [citation] this prejudgment garnishment procedure violates the fundamental principles of due process." (395 U.S. at p. 342 [23 L.Ed.2d at p. 354].) In the instant case, petitioner has been deprived not only of a portion of his wages, but of his entire livelihood; the hardships emphasized in *Sniadach* are thus clearly multiplied here. Moreover, even under the invalidated Wisconsin statute, the debtor in *Sniadach* was assured of some hearing on the merits before he was permanently deprived of his earnings; in the instant case, by contrast, under the majority's view petitioner will never receive any meaningful hearing on the validity of his dismissal.

The full anomaly of the majority's position in light of recent procedural due process developments is illustrated by the most recent decision, *Bell* v. *Burson* (1971) 402 U.S. 535 [29 L.Ed.2d 90, 91 S.Ct. 1586]. In *Bell*, an uninsured motorist's driver's license was suspended without notice or hearing, pursuant to a Georgia statute, after the motorist was involved in an accident and failed to post security for claimed damages; in the Supreme Court the motorist challenged the provision which authorized the summary suspension of his license on due process grounds. Justice Brennan, writing for a unanimous court,[18] reasoned that although the state could refuse to issue licenses to all uninsured motorists "[o]nce licenses are issued, as in petitioner's case, *their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken without that procedural due process required by the Fourteenth Amendment.* [Citing *Sniadach* and *Goldberg.*]" (402 U.S. at p. 539 [29 L.Ed.2d at p. 94].) Applying due process principles, the court invalidated the challenged statute in light of its summary operation.

The due process analysis in *Bell* decisively points up the incongruity of a decision denying the applicability of procedural due process in the instant case. In *Bell* the suspension of a driver's license was recognized as *affecting* an interest of sufficient importance to bring the procedural due process safeguards into play, precisely because such licenses "may become essential in the pursuit of a livelihood." (402 U.S. at p. 539 [29 L.Ed.2d at p. 94].) In

---

[18]Chief Justice Burger, Justice Black and Justice Blackmun simply concurred with the result in *Bell* without writing a separate opinion; there were no dissenters.

the instant case we deal not with an incidental interest, the denial of which may detrimentally affect one's livelihood, but with the question of the actual termination of the "livelihood" itself. Given *Bell* the instant matter must surely be the paradigmatic a fortiori case.

The majority cannot avoid the force of these recent decisions by falling back on the claim that public employment is merely a "privilege" which may be withdrawn summarily. Of the recent decisions, both *Goldberg* and *Bell* involved the termination of interests which could be characterized as "government largess," and yet the requirements of procedural due process were held applicable in each case; indeed, in *Bell* the court specifically emphasized that its recognition of the motorist's constitutional right to procedural due process upon the suspension of his license "is but an application of the general proposition that relevant constitutional restraints limit state power to terminate an entitlement whether the entitlement is denominated a 'right' or a 'privilege.'" (402 U.S. at p. 539 [29 L.Ed.2d at p. 94].)

Moreover, over the past decade lower federal and state courts have repeatedly recognized the constitutional necessity of affording notice and a meaningful hearing when the state withdraws governmental "benefits" by the expulsion or suspension[19] of a student from a public university (see, e.g., *Dixon* v. *Alabama State Board of Education* (5th Cir. 1961) 294 F.2d 150, cert. den. 368 U.S. 930 [7 L.Ed.2d 193, 82 S.Ct. 368]; *Goldberg* v. *Regents of the University of California* (1967) 248 Cal.App.2d 867, 877 [57 Cal. Rptr. 463]; cf. *Jones* v. *Tennessee State Bd. of Ed.* (1970) 397 U.S. 31, 32-36 [25 L.Ed.2d 27, 28-30, 90 S.Ct. 779] (Douglas and Brennan, JJ. dissenting from dismissal of writ as improvidently granted), or the eviction of a tenant from public housing. (See, e.g., *Escalera* v. *New York City Housing Authority* (2d Cir. 1970) 425 F.2d 853, 861, cert. den. 400 U.S. 853 [27 L.Ed.2d 91, 91 S.Ct. 54]; *Ruffin* v. *Housing Authority of New Orleans* (E.D. La. 1969) 301 F.Supp. 251, 252; cf. *Thorpe* v. *Housing Authority* (1967) 386 U.S. 670, 678 [18 L.Ed.2d 394, 399, 87 S.Ct. 1244] (Douglas, J. concurring).) As one legal scholar has recently observed: "Be-

---

[19]The incongruity of the majority's conclusion is vividly illustrated by the recent case of *Perlman* v. *Shasta Joint Jr. College Dist. Bd. of Trustees* (1970) 9 Cal.App. 3d 873 [88 Cal.Rptr. 563]. In *Perlman,* a student who had been suspended from a public college for five days without a formal hearing, challenged his suspension on due process grounds. Although the court ultimately concluded that the informal hearing the student had received adequately met due process standards, in light of all the circumstances, the court did recognize that even in a case involving the exaction of so minor a penalty "the authorities hold that . . . the student is entitled to a 'fair hearing.'" (9 Cal.App.3d at p. 879.) If a five-day suspension from college is sufficient to require a fair hearing, surely the permanent loss of one's employment must be sufficient to bring this minimal procedural safeguard into play.

ing fired from a government job is at least as serious a sanction as being evicted from a housing project or being suspended from college. Nor are there unique interests attending the government's function as employer that find no parallels in the responsibilities of landlord, educator and benefactor." (O'Neill, *Justice Delayed and Justice Denied,* 1970 Sup.Ct. Rev. 161, 207.)[20]

*Bell* establishes that the protections of procedural due process are applicable whenever the government "adjudicates important interests" (402 U.S. at p. 539 [29 L.Ed.2d at p. 94]). On any scale of values, an individual's interest in maintaining his employment is certainly an "important interest," and thus the minimal due process safeguard of an opportunity for a meaningful hearing must be afforded.

Of course, due process does not require that the government grant a discharged employee a formal trial on his dismissal, but only that he be afforded a hearing fair under all the circumstances. "Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account." (*Hannah* v. *Larche* (1960) 363 U.S. 420, 442 [4 L.Ed.2d 1307, 1321, 80 S.Ct. 1502]; see *Sokol* v. *Public Utilities Commission* (1965) 65 Cal.2d 247, 254 [53 Cal. Rptr. 673, 418 P.2d 265].)

Indeed, in the instant case, most of the traditional administrative objections to the additional expense and personnel required by hearings are inapplicable, since the county has already established a full hearing procedure, before an impartial body, to review the discharge or dismissal of all permanent employees. As noted earlier, this procedure does not provide a "meaningful hearing" only because the majority interpret the resolution to preclude the review board from affording effective relief.

In light of the constitutional considerations canvassed above, I believe Resolution No. 440-805 must be interpreted to permit the county review board to order the reinstatement of any employee it finds has been improperly discharged. Although no specific language of the resolution authorizes

---

[20]This conclusion finds further support in the numerous decisions discussed in the earlier section, which require due process procedures, including a meaningful hearing, to be afforded when business or professional licenses are to be revoked or when unions or professional associations seek to expel a member. (See, e.g., *Willner* v. *Committee on Character* (1963) 373 U.S. 96 [10 L.Ed.2d 224, 83 S.Ct. 1175]; *Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 143-144 [231 P.2d 6, 21 A.L.R.2d 1387]; *Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal. 3d 160, 166 [81 Cal.Rptr. 623, 460 P.2d 495].) As discussed above, the termination of employment today has a detrimental effect similar to that caused by adverse action in these other contexts.

this relief, courts have frequently implied a right to a hearing where constitutional problems would otherwise be created. (See, e.g., *Greene* v. *McElroy* (1959) 360 U.S. 474, 506-508 [3 L.Ed.2d 1377, 1396-1397, 79 S.Ct. 1400]; *Fascination, Inc.* v. *Hoover* (1952) 39 Cal.2d 260, 269-270 [246 P.2d 656]; cf. *Brotsky* v. *State Bar* (1962) 57 Cal.2d 287 [19 Cal. Rptr. 153, 368 P.2d 697, 94 A.L.R.2d 1310]; *English* v. *City of Long Beach* (1950) 35 Cal.2d 155 [217 P.2d 22, 18 A.L.R.2d 547].) The proposed interpretation of the resolution would permit us to sustain the constitutionality of the county's enactments and does no violence to the present review procedure.

### 4. Conclusion

In analyzing the due process aspects of discharges from public employment, I have found it convenient to approach the problem in terms of the two distinct categories of "substantive due process" (the prohibition of arbitrary state action) and "procedural due process." This separation, however, should not obscure the complementary nature of these two due process concepts.

The majority, however, have not made the error of affording only a single "prong" of the due process concept in the instant case, but rather have taken the drastic approach of denying the applicability of both. As explained above, the majority's conclusion is, in the final analysis, grounded on the premise that the strictures of the "due process" clause are not applicable *in any manner* to the government's discharge of a permanent employee. In my opinion this limited view of the reach of the due process clause is largely a remnant of the discredited "right-privilege" doctrine and is entirely incompatible with developments in constitutional analysis in recent years.

United States Supreme Court Justice Robert Jackson once declared: "To stand between the individual and arbitrary action by the government is the highest function of the court."[21] The majority, by the instant decision, default in that task.

Peters, J., concurred.

---

[21]Statement accompanying a stay of deportation of Knauff, issued as Circuit Justice of the Second Circuit May 17, 1950, quoted in W. Gellhorn & C. Byse, Administrative Law: Case & Comment (4th ed. 1960) p. 814.